## HURTADO *v.* PEOPLE OF CALIFORNIA.

### IN ERROR TO THE SUPREME COURT OF CALIFORNIA.

Argued January 22d, 23d, 1884.—Decided March 3d, 1884.

*Constitutional Law.*

1. The words "due process of law" in the Fourteenth Amendment of the Constitution of the United States do not necessarily require an indictment by a grand jury in a prosecution by a State for murder.
2. The Constitution of California authorizes prosecutions for felonies by information, after examination and commitment by a magistrate, without indictment by a grand jury, in the discretion of the legislature. The Penal Code of the State makes provision for an examination by a magistrate, in the presence of the accused, who is entitled to the aid of counsel

and the right of cross-examination of witnesses, whose testimony is to be reduced to writing, and upon a certificate thereon by the magistrate that a described offence has been committed, and that there is sufficient cause to believe the accused guilty thereof, and an order holding him to answer thereto, requires an information to be filed against the accused in the Superior Court of the county in which the offence is triable, in the form of an indictment for the same offence: *Held,* That a conviction upon such an information for murder in the first degree and a sentence of death thereon are not illegal by virtue of that clause of the Fourteenth Amendment to the Constitution of the United States, which prohibits the States from depriving any person of life, liberty or property without due process of law.

The Constitution of the State of California, adopted in 1879, in article I., section 8, provides as follows :

" Offences heretofore required to be prosecuted by indictment shall be prosecuted by information, after examination and commitment by a magistrate, or by indictment, with or without such examination and commitment, as may be prescribed by law. A grand jury shall be drawn and summoned at least once a year in each county."

Various provisions of the Penal Code regulate proceedings before the examining and committing magistrate in cases of persons arrested and brought before him upon charges of having committed public offences. These require, among other things, that the testimony of the witnesses shall be reduced to writing in the form of depositions ; and section 872 declares that if it appears from the examination that a public offence has been committed, and there is sufficient cause to believe the defendant guilty thereof, the magistrate must indorse on the depositions an order, signed by him, to that effect, describing the general nature of the offence committed, and ordering that the defendant be held to answer thereto. Section 809 of the Penal Code is as follows :

" When a defendant has been examined and committed, as provided in section 872 of this Code, it shall be the duty of the district attorney, within thirty days thereafter, to file in the Superior Court of the county in which the offence is triable, an information charging the defendant with such offence. The information shall

be in the name of the people of the State of California, and subscribed by the district attorney, and shall be in form like an indictment for the same offence."

In pursuance of the foregoing provision of the Constitution, and of the several sections of the Penal Code of California, the district attorney of Sacramento County, on the 20th day of February, 1882, made and filed an information against the plaintiff in error, charging him with the crime of murder in the killing of one José Antonio Stuardo. Upon this information, and without any previous investigation of the cause by any grand jury, the plaintiff in error was arraigned on the 22d day of March, 1882, and pleaded not guilty. A trial of the issue was thereafter had, and on May 7th, 1882, the jury rendered its verdict, in which it found the plaintiff in error guilty of murder in the first degree.

On the 5th day of June, 1882, the Superior Court of Sacramento County, in which the plaintiff in error had been tried, rendered its judgment upon said verdict, that the said Joseph Hurtado, plaintiff in error, be punished by the infliction of death, and the day of his execution was fixed for the 20th day of July, 1882.

From this judgment an appeal was taken, and the Supreme Court of the State of California affirmed the judgment.

On the 6th day of July, 1883, the Superior Court of said county of Sacramento ordered that the plaintiff in error be in court on the 11th day of July, 1883, in order that a day for the execution of the judgment in said cause should be fixed. In pursuance of said order, plaintiff in error, with his counsel, appeared at the bar of the court, and thereupon the judge asked him if he had any legal reason to urge why said judgment should not be executed, and why an order should not then be made fixing the day for the execution of the same.

Thereupon the plaintiff in error, by his counsel, objected to the execution of said judgment and to any order which the court might make fixing a day for the execution of the same, upon the grounds:

"7th. That it appeared upon the face of the judgment that the

plaintiff in error had never been legally, or otherwise, indicted or presented by any grand jury, and that he was proceeded against by information made and filed by the district attorney of the county of Sacramento, after examination and commitment by a magistrate of the said county.

" 8th. That the said proceedings, as well as the laws and Constitution of California, attempting to authorize them, and the alleged verdict of the jury, and judgment of the said Superior Court of said county of Sacramento, were in conflict with and prohibited by the Fifth and Fourteenth Articles of Amendment of the Constitution of the United States, and that they were therefore void.

" 9th. That the said plaintiff in error had been held to answer for the said crime of murder by the district attorney of the said county of Sacramento, upon an information filed by him, and had been tried and illegally found guilty of the said crime, without any presentment or indictment of any grand or other jury, and that the judgment rendered upon the alleged verdict of the jury in such case was and is void, and if executed would deprive the plaintiff in error of his life or liberty without due process of law."

Thereupon the court overruled the said objections, and fixed the 30th day of August, 1883, as the time for the execution of the sentence. From this latter judgment the plaintiff in error appealed to the Supreme Court of the State.

On the 18th day of September, 1883, the Supreme Court of the State affirmed the said judgment, to review which the present writ of error was allowed and has been prosecuted.

*Mr. A. L. Hart* for plaintiff in error.

*Mr. John T. Cary* for defendant in error.

Mr. Justice Matthews delivered the opinion of the court. After reciting the facts in the foregoing language, he continued:

It is claimed on behalf of the prisoner that the conviction and sentence are void, on the ground that they are repugnant to that clause of the Fourteenth Article of Amendment of the Constitution of the United States which is in these words:

"Nor shall any State deprive any person of life, liberty, or property without due process of law."

The proposition of law we are asked to affirm is that an indictment or presentment by a grand jury, as known to the common law of England, is essential to that "due process of law," when applied to prosecutions for felonies, which is secured and guaranteed by this provision of the Constitution of the United States, and which accordingly it is forbidden to the States respectively to dispense with in the administration of criminal law.

The question is one of grave and serious import, affecting both private and public rights and interests of great magnitude, and involves a consideration of what additional restrictions upon the legislative policy of the States has been imposed by the Fourteenth Amendment to the Constitution of the United States.

The Supreme Court of California, in the judgment now under review, followed its own previous decision in *Kalloch* v. *Superior Court*, 56 Cal. 229, in which the question was deliberately adjudged. Its conclusion was there stated as follows:

"This proceeding, as [it] is regulated by the Constitution and laws of this State, is not opposed to any of the definitions given of the phrases 'due process of law' and 'the law of the land;' but, on the contrary, it is a proceeding strictly within such definitions, as much so in every respect as is a proceeding by indictment. It may be questioned whether the proceeding by indictment secures to the accused any superior rights and privileges; but certainly a prosecution by information takes from him no immunity or protection to which he is entitled under the law."

And the opinion cites and relies upon a decision of the Supreme Court of Wisconsin in the case of *Rowan* v. *The State*, 30 Wis. 129. In that case the court, speaking of the Fourteenth Amendment, says:

"But its design was not to confine the States to a particular mode of procedure in judicial proceedings, and prohibit them from

prosecuting for felonies by information instead of by indictment, if they chose to abolish the grand jury system. And the words ' due process of law' in the amendment do not mean and have not the effect to limit the powers of State governments to prosecutions for crime by indictment; but these words do mean law in its regular course of administration, according to prescribed forms, and in accordance with the general rules for the protection of individual rights. Administration and remedial proceedings must change, from time to time, with the advancement of legal science and the progress of society; and, if the people of the State find it wise and expedient to abolish the grand jury and prosecute all crimes by information, there is nothing in our State Constitution and nothing in the Fourteenth Amendment to the Constitution of the United States which prevents them from doing so."

On the other hand, it is maintained on behalf of the plaintiff in error that the phrase " due process of law " is equivalent to "law of the land," as found in the 29th chapter of Magna Charta; that by immemorial usage it has acquired a fixed, definite, and technical meaning; that it refers to and includes, not only the general principles of public liberty and private right, which lie at the foundation of all free government, but the very institutions which, venerable by time and custom, have been tried by experience and found fit and necessary for the preservation of those principles, and which, having been the birthright and inheritance of every English subject, crossed the Atlantic with the colonists and were transplanted and established in the fundamental laws of the State; that, having been originally introduced into the Constitution of the United States as a limitation upon the powers of the government, brought into being by that instrument, it has now been added as an additional security to the individual against oppression by the States themselves; that one of these institutions is that of the grand jury, an indictment or presentment by which against the accused in cases of alleged felonies is an essential part of due process of law, in order that he may not be harassed or destroyed by prosecutions founded only upon private malice or popular fury.

This view is certainly supported by the authority of the

great name of Chief Justice Shaw and of the court in which he presided, which, in *Jones* v. *Robbins*, 8 Gray, 329, decided that the 12th article of the Bill of Rights of Massachusetts, a transcript of Magna Charta in this respect, made an indictment or presentment of a grand jury essential to the validity of a conviction in cases of prosecutions for felonies. In delivering the opinion of the court in that case, Merrick, J., alone dissenting, the Chief Justice said:

"The right of individual citizens to be secure from an open and public accusation of crime, and from the trouble, expense, and anxiety of a public trial before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious, and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty."
. . . . "It having been stated," he continued, "by Lord Coke, that by the 'law of the land' was intended a due course of proceeding according to the established rules and practice of the courts of common law, it may, perhaps, be suggested that this might include other modes of proceeding sanctioned by the common law, the most familiar of which are, by informations of various kinds, by the officers of the crown in the name of the King. But, in reply to this, it may be said that Lord Coke himself explains his own meaning by saying 'the law of the land,' as expressed in Magna Charta, was intended due process of law, that is, by indictment or presentment of good and lawful men. And further, it is stated, on the authority of Blackstone, that informations of every kind are confined by the constitutional law to misdemeanors only. 4 Bl. Com. 310."

Referring again to the passage from Lord Coke, he says, p. 343:

"This may not be conclusive, but, being a construction adopted by a writer of high authority before the emigration of our ancestors, it has a tendency to show how it was then understood."

This passage from Coke seems to be the chief foundation of the opinion for which it is cited; but a critical examination and

comparison of the text and context will show that it has been misunderstood; that it was not intended to assert that an indictment or presentment of a grand jury was essential to the idea of due process of law in the prosecution and punishment of crimes, but was only mentioned as an example and illustration of due process of law as it actually existed in cases in which it was customarily used. In beginning his commentary on this chapter of Magna Charta, 2 Inst. 46, Coke says:

"This chapter containeth nine several branches":

"1. That no man be taken or imprisoned but *per legem terræ,* that is, by the *common law, statute law, or custom of England;* for the words *per legem terræ,* being towards the end of this chapter, doe referre to all the precedent matters in the chapter, etc.

"2. No man shall be disseised, etc., unless it be by the lawful judgment, that is, verdict of his equals, (that is of men of his own condition,) *or by the law of the land, (that is to speak it once for all,) by the due course and process of law."*

He then proceeds to state that, 3, no man shall be outlawed, unless according to the law of the land; 4, no man shall be exiled, unless according to the law of the land; 5, no man shall be in any sort destroyed, "unlesse it be by the verdict of his equals, or according to the law of the land;" 6, "no man shall be condemned at the King's suite, either before the King in his bench, where the pleas are *coram rege,* (and so are the words *nec super eum ibimus* to be understood,) nor before any other commissioner or judge whatsoever, and so are the words *nec super eum mittemus* to be understood, but by the judgment of his peers, that is, equals, or according to the law of the land."

Recurring to the first clause of the chapter, he continues:

"1. No man shall be taken (that is) restrained of liberty by petition or suggestion to the King or to his councill, unless it be by indictment or presentment of good and lawfull men, where such deeds be done. This branch and divers other parts of this act have been notably explained by divers acts of Parliament, &c., quoted in the margent."

The reference is to various acts during the reign of Edward

III.   And reaching again the words " *nisi per legem terræ*," he continues :

" But by the law of the land.   For the true sense and exposition of these words see the statute of 37 E. 3, cap. 8, where the words, by the law of the land, are rendered, without due proces of the law, for there it is said, though it be contained in the Great Charter, that no man be taken, imprisoned, or put out of his freehold without proces of the law, that is, by indictment of good and lawfull men, where such deeds be done. in due manner, or by writ originall of the common law.   Without being brought in to answere but by due proces of the common law.   No man be put to answer without presentment before justices, or thing of record, or by due proces, or by writ originall, according. to the old law of the land. Wherein it is to be observed that this chapter is but declaratory of the old law of England."

It is quite apparent from these extracts that the interpretation usually put upon Lord Coke's statement is too large, because if an indictment or presentment by a grand jury is essential to due process of law in all cases of imprisonment for crime, it applies not only to felonies but to misdemeanors and petty offences, and the conclusion would be inevitable that informations as a substitute for indictments would be illegal in all cases. It was indeed so argued by Sir Francis Winninton in *Mr. Prynn's Case*, 5 Mod. 459, from this very language of 'Magna Charta, that all suits of the King must be by presentment or indictment, and he cited Lord Coke as authority to that effect. He attempted to show that informations had their origin in the act of 11 Hen. 7, c. 3, enacted in 1494, known as the infamous Empson and Dudley act, which was repealed by that of 1 Hen. 8, c. 6, in 1509.   But the argument was overruled, Lord Holt saying that to hold otherwise " would be a reflection on the whole bar."   Sir Bartholomew Shower, who was prevented from arguing in support of the information, prints his intended argument in his report of the case under the name of *The King* v. *Berchet*, 1 Show. 106, in which, with great thoroughness, he arrays all the learning of the time on the subject.   He undertakes to " evince that this method of prosecution is noways con-

trariant to any fundamental rule of law, but agreeable to it."
He answers the objection that it is inconvenient and vexatious
to the subject by saying (p. 117):

" Here is no inconvenience to the people.   Here is a trial *per
pais,* fair notice, liberty of pleading *dilatories* as well as *bars.*
Here is *subpœna* and *attachment,* as much time for defence, charge,
&c., for the prosecutor makes up the record, &c.; then, in case of
malicious prosecution, the person who prosecutes is known by the
note to the coroner, according to the practice of the court."

He answers the argument drawn from Magna Charta, and
says:

" That this method of prosecution no way contradicts that law,
for we say this is *per legem terræ et per communem legem terræ,*
for otherwise there never had been so universal a practice of it in
all ages."

And referring to Coke's comment, that "no man shall be
taken," *i. e.,* restrained of liberty by petition or suggestion to
the King or his Council unless it be by indictment or present-
ment, he says (p. 122):

" By petition or suggestion can never be meant of the King's
Bench, for he himself had preferred several here ; that is meant
only of the the King alone, or in Council, or in the Star Chamber.
In the King's Bench the information is not a suggestion to the
*King,* but to the *court* upon record."

And he quotes 3 Inst. 136, where Coke modifies the state-
ment by saying, " The King cannot put any to answer, but his
court must be apprized of the crime by indictment, present-
ment, or *other matter of record,*" which, Shower says, includes
an information.

So it has been recently held that upon a coroner's inquisition
taken concerning the death of a man and a verdict of guilty of
murder or manslaughter is returned, the offender may be prose-
cuted and tried without the intervention of a grand jury.   *Reg.*
v. *Ingham,* 5 B. & S. 257.   And it was said by Buller, J., in

*Rex* v. *Joliffe*, 4 T. R. '285–293, that if to an action for slander in charging the plaintiff with felony a justification is pleaded which is found by the jury, that of itself amounts to an indictment, as if it had been found by the grand jury, and is sufficient to put the party thus accused on his trial.

The language of Lord Coke applies only to forfeitures of life and liberty at the suit of the King, and hence appeals of murder, which were prosecutions by private persons, were never regarded as contrary to Magna Charta. On the contrary, the appeal of death was by Lord Holt " esteemed a noble remedy and a badge of the rights and liberties of an Englishman." *Rex* v. *Toler*, 1 Ld. Raymond, 555–557; 12 Mod. 375; Holt, 483. We are told that in the early part of the last century, in England, persons who had been acquitted on indictments for murder were often tried, convicted and executed on appeals. Kendall on Trial by Battel (3d Ed.), 44–47. An appeal of murder was brought in England as lately as 1817, but defeated by the appellant's declining to accept the wager of battel. *Ashford* v. *Thornton*, 1 B. & Ald. 405. The English statutes concerning appeals of murder were in force in the Provinces of Pennsylvania and Maryland. *Report of Judges*, 3 Binn. 599–604; Kilty on Maryland Statutes, 141, 143, 158. It is said that no such appeal was ever brought in Pennsylvania; but in Maryland, in 1765, a negro was convicted and executed upon such an appeal. *Soper* v. *Tom*, 1 Har. & McHen. 227. See note to *Paxton's Case*, Quincy's Mass. Rep. 53, by Mr. Justice Gray.

This view of the meaning of Lord Coke is the one taken by Merrick, J., in his dissenting opinion in *Jones* v. *Robbins*, 8 Gray, 329, who states his conclusions in these words:

" It is the forensic trial, under a broad and general law, operating equally upon every member of our community, which the words, ' by the law of the land,' in Magna Charta, and in every subsequent declaration of rights which has borrowed its phraseology, make essential to the safety of the citizen, securing thereby both his liberty and his property, by preventing the unlawful arrest of his person or any unlawful interference with his estate." See also *State* v. *Starling*, 15 Rich. (S. C.) Law, 120.

Mr. Reeve, in 2 History of Eng. Law, 43, translates the phrase, *nisi per legale judicium parium suorum vel per legem terræ,*

"But by the judgment of his peers, or by some other legal process or proceeding adapted by the law to the nature of the case."

Chancellor Kent, 2 Com. 13, adopts this mode of construing the phrase. Quoting the language of Magna Charta, and referring to Lord Coke's comment upon it, he says:

"The better and larger definition of *due process of law* is that it means law in its regular course of administration through courts of justice."

This accords with what is said in *Westervelt* v. *Gregg*, 12 N. Y. 202, by Denio, J., p. 212:

"The provision was designed to protect the citizen against all mere acts of power, whether flowing from the legislative or executive branches of the government."

The principal and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson, in *Bank of Columbia* v. *Okely*, 4 Wheat. 235–244:

"As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice."

And the conclusion rightly deduced is, as stated by Mr. Cooley, Constitutional Limitations, 356:

"The principles, then, upon which the process is based, are to determine whether it is 'due process' or not, and not any considerations of mere form. Administrative and remedial process may

be · changed from time to time, but only with due regard to the landmarks established for the protection of the citizen."

It is urged upon us, however, in argument, that the claim made in behalf of the plaintiff in error is supported by the decision of this court in *Murray's Lessee* v. *Hoboken Land & Improvement Company,* 18 How. 272. There Mr. Justice Curtis, delivering the opinion of the court, after showing, p. 276, that due process of law must mean something more than the actual existing law of the land, for otherwise it would be no restraint upon legislative power, proceeds as follows:

" To what principle, then, are we to resort to ascertain whether this process, enacted by Congress, is due process? To this the answer must be twofold. We must examine the Constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political · condition by having been acted on by them after the settlement of this country."

This, it is argued, furnishes an indispensable test of what constitutes " due process of law ; " that any proceeding otherwise authorized by law, which is not thus sanctioned by usage, or which supersedes and displaces one that is, cannot be regarded as due process of law.

But this inference is unwarranted. The real syllabus of the passage quoted is, that a process of law, which is not otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country ; but it by no means follows that nothing else can be due process of law. The point in the case cited arose in reference to a summary proceeding, questioned on that account, as not due process of law. The answer was: however exceptional it may be, as tested by definitions and principles of ordinary procedure, nevertheless, this, in substance, has been immemorially the actual law of the land, and, therefore, is due process of law.

But to hold that such a characteristic is essential to due process of law, would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians.

This would be all the more singular and surprising, in this quick and active age, when we consider that, owing to the progressive development of legal ideas and institutions in England, the words of Magna Charta stood for very different things at the time of the separation of the American colonies from what they represented originally. For at first the words *nisi per legale judicium parium* had no reference to a jury; they applied only to the *pares regni*, who were the constitutional judges in the Court of Exchequer and *coram rege.* Bac. Abr. Juries, 7th Ed., Lond., note, Reeve, H. L. 41. And as to the grand jury itself, we learn of its constitution and functions from the Assize of Clarendon, A. D. 1164, and that of Northampton, A. D. 1176, Stubbs' Charters, 143–150. By the latter of these, which was a republication of the former, it was provided, that "if any one is accused before the justices of our Lord the King of murder, or theft, or robbery, or of harbouring persons committing those crimes, or of forgery or arson, by the oath of twelve knights of the hundred, or, if there are no knights, by the oath of twelve free and lawful men, and by the oath of four men from each township of the hundred, let him go to the ordeal of water, and, if he fails, let him lose one foot. And at Northampton it was added, for greater strictness of justice (*pro rigore justitiæ*), that he shall lose his right hand at the same time with his foot, and abjure the realm and exile himself from the realm within forty days. And if he is acquitted by the ordeal, let him find pledges and remain in the kingdom, unless he is accused of murder or other base felony by the body of the country and the lawful knights of the country; but if he is so accused as aforesaid, although he is acquitted by the ordeal of water, nevertheless he must leave the kingdom in forty days and take his chattels with him, subject to the rights of his lords, and he must abjure the kingdom at the mercy of our Lord the King."

" The system thus established," says Mr. Justice Stephens, 1
Hist. Crim. Law of England, 252, " is simple.    The body of the
country are the accusers.    Their accusation is practically equiva-
lent to a conviction, subject to the chance of a favorable termina-
tion of the ordeal by water.    If the ordeal fails, the accused per-
son loses his foot and his hand.    If it succeeds, he is nevertheless
to be banished.    Accusation, therefore, was equivalent to banish-
ment, at least."

When we add to this that the primitive grand jury heard no
witnesses in support of the truth of the charges to be preferred,
but presented upon their own knowledge, or indicted upon
common fame and general suspicion, we shall be ready to
acknowledge that it is better not to go too far back into an-
tiquity for the best securities for our " ancient liberties."    It is
more consonant to the true philosophy of our historical legal
institutions to say that the spirit of personal liberty and indi-
vidual right, which they embodied, was preserved and devel-
oped by a progressive growth and wise adaptation to new cir-
cumstances and situations of the forms and processes found fit
to give, from time to time, new expression and greater effect
to modern ideas of self-government.

This flexibility and capacity for growth and adaptation is the
peculiar boast and excellence of the common law.    Sir James
Mackintosh ascribes this principle of development to Magna
Charta itself.    To use his own language :

" It was a peculiar advantage that the consequences of its prin-
ciples were, if we may so speak, only discovered slowly and
gradually.    It gave out on each occasion only so much of the
spirit of liberty and reformation as the circumstances of succeed-
ing generations required and as their character would safely bear.
For almost five centuries it was appealed to as the decisive author-
ity on behalf of the people, though commonly so far only as the
necessities of each case demanded."    1 Hist. of England, 221.

The Constitution of the United States was ordained, it is
true, by descendants of Englishmen, who inherited the tradi-
tions of English law and history ; but it was made for an un-

defined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues. And while we take just pride in the principles and institutions of the common law, we are not to forget that in lands where other systems of jurisprudence prevail, the ideas and processes of civil justice are also not unknown. Due process of law, in spite of the absolutism of continental governments, is not alien to that code which survived the Roman Empire as the foundation of modern civilization in Europe, and which has given us that fundamental maxim of distributive justice—*suum cuique tribuere.* There is nothing in Magna Charta, rightly construed as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every age; and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms.

The concessions of Magna Charta were wrung from the King as guaranties against the oppressions and usurpations of his prerogative. It did not enter into the minds of the barons to provide security against their own body or in favor of the Commons by limiting the power of Parliament; so that bills of attainder, *ex post facto* laws, laws declaring forfeitures of estates, and other arbitrary acts of legislation which occur so frequently in English history, were never regarded as inconsistent with the law of the land; for notwithstanding what was attributed to Lord Coke in *Bonham's Case,* 8 Rep. 115, 118 *a,* the omnipotence of Parliament over the common law was absolute, even against common right and reason. The actual and practical security for English liberty against legislative tyranny was the power of a free public opinion represented by the Commons.

In this country written constitutions were deemed essential to protect the rights and liberties of the people against the encroachments of power delegated to their governments, and the provisions of Magna Charta were incorporated into Bills of

Rights. They were limitations upon all the powers of government, legislative as well as executive and judicial.

It necessarily happened, therefore, that as these broad and general maxims of liberty and justice held in our system a different place and performed a different function from their position and office in English constitutional history and law, they would receive and justify a corresponding and more comprehensive interpretation. Applied in England only as guards against executive usurpation and tyranny, here they have become bulwarks also against arbitrary legislation ; but, in that application, as it would be incongruous to measure and restrict them by the ancient customary English law, they must be held to guarantee not particular forms of procedure, but the very substance of individual rights to life, liberty, and property.

Restraints that could be fastened upon executive authority with precision and detail, might prove obstructive and injurious when imposed on the just and necessary discretion of legislative power; and, while in every instance, laws that violated express and specific injunctions and prohibitions, might, without embarrassment, be judicially declared to be void, yet, any general principle or maxim, founded on the essential nature of law, as a just and reasonable expression of the public will and of government, as instituted by popular consent and for the general good, can only be applied to cases coming clearly within the scope of its spirit and purpose, and not to legislative provisions merely establishing forms and modes of attainment. Such regulations, to adopt a sentence of Burke's, "may alter the mode and application but have no power over the substance of original justice." Tract on the Popery Laws, 6 Burke's Works, ed. Little & Brown, 323.

Such is the often-repeated doctrine of this court. In *Munn* v. *Illinois*, 94 U. S. 113–134, the Chief Justice, delivering the opinion of the court, said :

"A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken

away without due process; but the law itself, as a rule of conduct, may be changed at the will or even at the whim of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances."

And in *Walker* v. *Savinet*, 92 U. S. 90, the court said:

"A trial by jury in suits at common law pending in State courts is not, therefore, a privilege or immunity of national citizenship which the States are forbidden by the Fourteenth Amendment to abridge. A State cannot deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the State courts affecting the property of persons must be by jury. This requirement of the Constitution is met if the trial is had according to the settled course of judicial proceedings. Due process of law is process according to the law of the land. This process in the States is regulated by the law of State."

In *Kennard* v. *Louisiana ex rel. Morgan*, 92 U. S. 480, the question was whether a mode of trying the title to an office, in which was no provision for a jury, was due process of law. Its validity was affirmed. The Chief Justice, after reciting the various steps in the proceeding, said:

"From this it appears that ample provision has been made for the trial of the contestation before a court of competent jurisdiction; for bringing the party against whom the proceeding is had before the court and notifying him of the case he is required to meet; for giving him an opportunity to be heard in his defence; for the deliberation and judgment of the court; for an appeal from this judgment to the highest court of the State, and for hearing and judgment there. A mere statement of the facts carries with it a complete answer to all the constitutional objections urged against the validity of the act."

And Mr. Justice Miller, in *Davidson* v. *New Orleans*, 96 U. S. 97–105, after showing the difficulty, if not the impossibility of framing a definition of this constitutional phrase, which

should be "at once perspicuous, comprehensive, and satisfactory," and thence deducing the wisdom "in the ascertaining of the intent and application of such an important phrase in the Federal Constitution, by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require," says, however, that:

"It is not possible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issues affecting it, he has by the laws of the State a fair trial in a court of justice, according to the modes of proceeding applicable to such a case." See also *Missouri* v. *Lewis*, 101 U. S. 22–31; *Ex parte Wall*, 107 U. S. 288–290.

We are to construe this phrase in the Fourteenth Amendment by the *usus loquendi* of the Constitution itself. The same words are contained in the Fifth Amendment. That article makes specific and express provision for perpetuating the institution of the grand jury, so far as relates to prosecutions for the more aggravated crimes under the laws of the United States. It declares that:

"No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall he be compelled in any criminal case to be witness against himself." [It then immediately adds]: "Nor be deprived of life, liberty, or property, without due process of law."

According to a recognized canon of interpretation, especially applicable to formal and solemn instruments of constitutional law, we are forbidden to assume, without clear reason to the contrary, that any part of this most important amendment is superfluous. The natural and obvious inference is, that in the sense of the Constitution, "due process of law" was not meant or intended to include, *ex vi termini*, the institution and procedure of a grand jury in any case. The conclusion is equally

irresistible, that when the same phrase was employed in the Fourteenth Amendment to restrain the action of the States, it was used in the same sense and with no greater extent; and that if in the adoption of that amendment it had been part of its purpose to perpetuate the institution of the grand jury in all the States, it would have embodied, as did the Fifth Amendment, express declarations to that effect. Due process of law in the latter refers to that law of the land which derives its authority from the legislative powers conferred upon Congress by the Constitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law. In the Fourteenth Amendment, by parity of reason, it refers to that law of the land in each State, which derives its authority from the inherent and reserved powers of the State, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and the greatest security for which resides in the right of the people to make their own laws, and alter them at their pleasure.

"The Fourteenth Amendment" [as was said by Mr. Justice Bradley in *Missouri* v. *Lewis*, 101 U. S. 22–31] "does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each State prescribes its own modes of judicial proceeding."

But it is not to be supposed that these legislative powers are absolute and despotic, and that the amendment prescribing due process of law is too vague and indefinite to operate as a practical restraint. It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case, but, in the language of Mr. Webster, in his familiar definition, "the general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial," so "that every citizen shall

hold his life, liberty, property and immunities under the protection of the general rules which govern society," and thus excluding, as not due process of law, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments and decrees, and other similar special, partial and arbitrary exertions of power under the forms of legislation. Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude. And the limitations imposed by our constitutional law upon the action of the governments, both State and national, are essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions. The enforcement of these limitations by judicial process is the device of self-governing communities to protect the rights of individuals and minorities, as well against the power of numbers, as against the violence of public agents transcending the limits of lawful authority, even when acting in the name and wielding the force of the government.

The Supreme Court of Mississippi, in a well-considered case, *Brown* v. *Levee Commissioners*, 50 Miss. 468, speaking of the meaning of the phrase "due process of law," says:

"The principle does not demand that the laws existing at any point of time shall be irrepealable, or that any forms of remedies shall necessarily continue. It refers to certain fundamental rights which that system of jurisprudence, of which ours is a derivative, has always recognized. If any of these are disregarded in the proceedings by which a person is condemned to the loss of life, liberty, or property, then the deprivation has not been by 'due process of law.'"

This court, speaking by Mr. Justice Miller, in *Loan Association* v. *Topeka*, 20 Wall. 655–662, said:

"It must be conceded that there are such rights in every free government beyond the control of the State. A government

which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a despotism. It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is nevertheless a despotism. It may be doubted, if a man is to hold all that he is accustomed to call his own, all in which he has placed his happiness and the security of which is essential to that happiness, under the unlimited dominion of others, whether it is not wiser that this power should be exercised by one man than by many."

It follows that any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power, in furtherance of the general public good, which regards and preserves these principles of liberty and justice, must be held to be due process of law.

The Constitution of Connecticut, adopted in 1818 and in force when the Fourteenth Amendment took effect, requires an indictment or presentment of a grand jury only in cases where the punishment of the crime charged is death or imprisonment for life, and yet it also declares that no person shall " be deprived of life, liberty, or property but by due course of law." It falls short, therefore, of that measure of protection which it is claimed is guaranteed by Magna Charta to the right of personal liberty; notwithstanding which it is no doubt justly said in Swift's Digest, 17, that

" This sacred and inestimable right, without which all others are of little value, is enjoyed by the people of this State in as full extent as in any country on the globe, and in as high a degree as is consistent with the nature of civil government. No individual. or body of men has a discretionary or arbitrary power to commit any person to prison ; no man can be restrained of his liberty, be prevented from removing himself from place to place as he chooses, be compelled to go to a place contrary to his inclination, or be in any way imprisoned or confined, unless by virtue of the express laws of the land."

Tried by these principles, we are unable to say that the substitution for a presentment or indictment by a grand jury of the proceeding by information, after examination and commitment by a magistrate, certifying to the probable guilt of the defendant, with the right on his part to the aid of counsel, and to the cross-examination of the witnesses produced for the prosecution, is not due process of law. It is, as we have seen, an ancient proceeding at common law, which might include every case of an offence of less grade than a felony, except misprision of treason; and in every circumstance of its administration, as authorized by the statute of California, it carefully considers and guards the substantial interest of the prisoner. It is merely a preliminary proceeding, and can result in no final judgment, except as the consequence of a regular judicial trial, conducted precisely as in cases of indictments.

In reference to this mode of proceeding at the common law, and which he says "is as ancient as the common law itself," Blackstone adds (4 Com. 305):

"And as to those offences in which informations were allowed as well as indictments, so long as they were confined to this high and respectable jurisdiction, and were carried on in a legal and regular course in His Majesty's Court of King's Bench, the subject had no reason to complain. The same notice was given, the same process was issued, the same pleas were allowed, the same trial by jury was had, the same judgment was given by the same judges, as if the prosecution had originally been by indictment."

For these reasons, finding no error therein, the judgment of the Supreme Court of California is                    *Affirmed.*

Mr. Justice Harlan, dissenting.

The plaintiff in error, Joseph Hurtado, now under sentence of death pronounced in one of the courts of California, brings this writ of error upon the ground that the proceedings against him are in violation of the Constitution of the United States. The crime charged, and of which he was found guilty, is murder. The prosecution against him is not based upon any presentment or indictment of a grand jury, but upon an information filed

by the district attorney of the county in which the crime was alleged to have been committed. His contention is that an information for a capital offence is forbidden by that clause of the Fourteenth Amendment of the Constitution of the United States which declares that no State shall "deprive any person of life, liberty, or property without due process of law." As I cannot agree that the State may, consistently with due process of law, require a person to answer for a capital offence, except upon the presentment or indictment of a grand jury, and as human life is involved in the judgment rendered here, I do not feel at liberty to withhold a statement of the reasons for my dissent from the opinion of the court.

The phrase "due process of law" is not new in the constitutional history of this country or of England. It antedates the establishment of our institutions. Those who had been driven from the mother country by oppression and persecution brought with them, as their inheritance, which no government could rightfully impair or destroy, certain guaranties of the rights of life and liberty, and property, which had long been deemed fundamental in Anglo-Saxon institutions. In the Congress of the Colonies held in New York in 1765, it was declared that the colonies were entitled to all the essential rights, liberties, privileges, and immunities, confirmed by Magna Charta to the subjects of Great Britain. Hutch. Hist. Mas. Bay, Appendix F. "It was under the consciousness," says Story, "of the full possession of the rights, liberties and immunities of British subjects, that the colonists in almost all the early legislation of their respective assemblies insisted upon a declaratory act, acknowledging and confirming them." 1 Story Const. § 165. In his speech in the House of Lords, on the doctrine of taxation without representation, Lord Chatham maintained that the inhabitants of the colonies were entitled to all the rights and the peculiar privileges of Englishmen; that they were equally bound by the laws, and equally entitled to participate in the constitution of England. On the 14th of October, 1774, the delegates from the several Colonies and Plantations, in Congress assembled, made a formal declaration of the rights to which their people were entitled, by the immutable laws

of nature, the principles of the English Constitution, and the several charters or compacts under which the colonial governments were organized. Among other things, they declared that their ancestors who first settled the colonies were, at the time of their immigration, "entitled to all the rights, liberties, and immunities of free and natural born subjects within the realm of England;" that "by such immigration they by no means forfeited, surrendered, or lost any of those rights, but that they were, and their descendants now are, entitled to the exercise and enjoyment of all such of them as their local and other circumstances entitle them to exercise and enjoy;" and that "the respective colonists are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." 1 Journal of Congress, 27–8–9.

These declarations were subsequently emphasized in the most imposing manner, when the doctrines of the common law respecting the protection of the people in their lives, liberties and property were incorporated into the earlier constitutions of the original States. Massachusetts, in its Constitution of 1780, and New Hampshire in 1784, declared in the same language that "no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers or the law of the land;" Maryland and North Carolina in 1776 and South Carolina in 1778, that "no freeman of this State be taken or imprisoned, or disseized of his freehold, liberties, or privileges, outlawed, exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land;" Virginia in 1776, that "no man be deprived of his liberty except by the law of the land or the judgment of his peers;" and Delaware, in 1792, that no person "shall be deprived of life, liberty, or property, unless by the judgment of his peers or the law of the land." In the ordinance of 1789 for the government of the Northwestern Territory, it was made one of the articles of compact between the original States and the people and States to be formed out of

that Territory—"to remain forever unalterable unless by common consent"—that "no man shall be deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land." These fundamental doctrines were subsequently incorporated into the Constitution of the United States. The people were not content with the provision in section 2 of article 3, that "the trial of all crimes, except in cases of impeachment, shall be by jury." They desired a fuller and broader enunciation of the fundamental principles of freedom, and therefore demanded that the guaranties of the rights of life, liberty, and property, which experience had proved to be essential to the safety and security of the people, should be placed beyond all danger of impairment or destruction by the general government through legislation by Congress. They perceived no reason why, in respect of those rights, the same limitations should not be imposed upon the general government that had been imposed upon the States by their own Constitutions. Hence the prompt adoption of the original amendments, by the Fifth of which it is, among other things, provided that "no person shall be deprived of life, liberty, or property, without due process of law." This language is similar to that of the clause of the Fourteenth Amendment now under examination. That similarity was not accidental, but evinces a purpose to impose upon the States the same restrictions, in respect of proceedings involving life, liberty and property, which had been imposed upon the general government.

"Due process of law," within the meaning of the national Constitution, does not import one thing with reference to the powers of the States, and another with reference to the powers of the general government. If particular proceedings conducted under the authority of the general government, and involving life, are prohibited, because not constituting that due process of law required by the Fifth Amendment of the Constitution of the United States, similar proceedings, conducted under the authority of a State, must be deemed illegal as not being due process of law within the meaning of the Fourteenth Amendment. What, then, is the meaning of the words "due process of law" in the latter amendment?

In seeking that meaning we are, fortunately, not left without authoritative directions as to the source, and the only source, from which the necessary information is to be obtained. In *Murray's Lessees* v. *Hoboken, &c.*, 18 How. 272, 276–7, it was said: " The Constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave Congress free to make any process ' due process of law' by its mere will. To what principles are we to resort to ascertain whether this process enacted by Congress is due process? To this the answer must be two-fold. We must examine the Constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look *to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country.*"

Magna Charta—upon which rested the rights, liberties and immunities of our ancestors—was called, said Coke, " the Charter of the Liberties of the Kingdom, upon great reason, because *liberos facit*, it makes the people free." Hallam characterizes the signing of it as the most important event in English history, and declares that the instrument is still the keystone of English liberty. " To have produced it," said Mackintosh, " to have preserved it, to have matured it, constitute the immortal claim of England upon the esteem of mankind." By that instrument the King, representing the sovereignty of the nation, declared that " no freeman shall be taken, or imprisoned, or be disseized of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed ; nor will we [not] pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land."

"The words due 'process of law' were undoubtedly intended," said this court, in *Murray's Lessees* v. *Hoboken, &c.*, "to convey the same meaning as the words 'by the law of the land' in *Magna Charta*." That the one is the equivalent of the other was recognized in *Davidson* v. *New Orleans*, 96 U. S. 97. See also 2 Kent, 13; 2 Story Const. § 1789; Cooley's Const. Lim. 353; Pomeroy's Const. Law, § 245; *Greene* v. *Briggs*, 1 Curtis, 325. Whether the phrase in our American constitutions, national or State, be "law of the land" or "due process of law," it means in every case the same thing. Cooley's Const. Lim. 352.

Declining to follow counsel in their search for precedents in England in support or in refutation of the proposition that the common law permitted informations in certain classes of public offences, and conceding that in some cases, such as *Mr. Prynn's Case*, 5 Mod. 459, which was an information for a riot, tried before Chief Justice Holt, the requirement of due process of law was met by that mode of procedure, let us inquire—and no other inquiry is at all pertinent—whether according to the settled usages and modes of proceeding to which, this court has said, reference must be had, an information for a capital offence was, prior to the adoption of our Constitution, regarded as due process of law.

Erskine, in his speech delivered in 1784, in defence of the Dean of St. Asaph, said, in the presence of the judges of the King's Bench: "If a man were to commit a capital offence in the face of all the judges of England, their united authority could not put him upon his trial; they could file no complaint against him, even upon the records of the supreme criminal court, but could only commit him for safe custody, which is equally competent to every common justice of the peace. The grand jury alone could arraign him, and in their discretion might likewise finally discharge him, by throwing out the bill, with the names of all your lordships as witnesses on the back of it. If it be said that this exclusive power of the grand jury does not extend to lesser misdemeanors, which may be prosecuted by information, I answer, that for that reason it becomes doubly necessary to preserve the power of the other jury which

is left." That this defender of popular rights against official oppression was not in error when saying that no person could be arraigned for a capital offence except upon the presentment or indictment of a grand jury, is shown upon almost every page of the common law.

Blackstone says: "But to find a bill there must be at least twelve of the jury agree; for, so tender is the law of England of the lives of the subjects, that no man can be convicted at the suit of the King of any capital offence, unless by an unanimous voice of twenty-four of his equals and neighbors, that is, by twelve at least of the grand jury, in the first place, assenting to the accusation, and afterwards by the whole petit jury, of twelve more, finding him guilty upon his trial." 4 Bl. Com. 306. The same author, after referring to prosecutions by information, describing their different kinds, and stating that the mode of prosecution by information (or suggestion) filed on record by the King's attorney-general, or by his coroner or master of the crown office in the Court of King's Bench, was as ancient as the common law itself, proceeds: "But these informations (of every kind) are confined by the constitutional law to mere misdemeanors only; for, wherever any capital offence is charged, the same law requires that the accusation be warranted by the oath of twelve men, before the party shall be put to answer it." 4 Bl. Com. 309–10. Again, in his discussion of the trial by jury, Blackstone, after observing that the English law has "wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown," says: "The founders of the English law have, with excellent forecast, contrived that no man shall be called to answer the King for any capital crime, unless upon the peremptory accusation of twelve or more of his fellow-subjects, the grand jury; and that the truth of any accusation, whether preferred in the shape of an indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion. So that the liberties of England cannot but subsist so long as this *palladium* remains sacred and inviolate, not only from all

open attacks (which none will be so hardy as to make), but also from all secret machinations which may sap and undermine it, by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue, and courts of conscience. And however *convenient* these may appear at first (as doubtless all arbitrary powers, well executed, are the most *convenient*), yet let it be again remembered that delays and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon the sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread to the utter disuse of jurors in questions of the most momentous concern." 4 Bl. Com. 349–50.

Hawkins, in his Pleas of the Crown (Bk. 2, chap. 26), after saying that it is every-day practice to proceed by information in certain cases, says: "But I do not find it anywhere holden that such an information will lie for any capital crime, or for misprision of treason." In Wooddeson's Lectures on the Laws of England (Lect. 38), it is said that "informations cannot be brought in capital cases, nor for misprision of treason." Bacon, in his Abridgment, lays it down: "But though, as my Lord Hale observes, in *all* criminal causes the most regular and safe way, and most consonant to the statute of Magna Charta, &c., is by presentment or indictment of twelve sworn men, yet he admits that, for crimes *inferior to capital ones*, the proceedings may be by information." Title Information A. See also 2 Hal. Hist. P. C. c. 201; Jacobs' Law Dictionary, Title Information; Broom's Com. Laws England, vol. 4, p. 396; Story's Const. § 1784.

I omit further citations of authorities, which are numerous, to prove that, according to the settled usages and modes of proceeding existing under the common and statute law of England at the settlement of this country, information in capital cases was not consistent with the "law of the land," or with "due process of law." Such was the understanding of the patriotic men who established free institutions upon this conti-

nent.   Almost the identical words of Magna Charta were in-
corporated into most of the State Constitutions before the
adoption of our national Constitution.   When they declared,
in substance, that no person should be deprived of life, liberty,
or property, except by the judgment of his peers or the law of
the land, they intended to assert his right to the same guaran-
ties that were given in the mother country by the great char-
ter and the laws passed in furtherance of its fundamental
principles.

My brethren concede that there are principles of liberty and
justice, lying at the foundation of our civil and political insti-
tutions, which no State can violate consistently with that due
process of law required by the Fourteenth Amendment in pro-
ceedings involving life, liberty, or property.   Some of these
principles are enumerated in the opinion of the court.   But,
for reasons which do not impress my mind as satisfactory,
they exclude from that enumeration the exemption from pros-
ecution, by information, for a public offence involving life.
By what authority is that exclusion made?   Is it justified by
the settled usages and modes of proceedure existing under the
common and statute law of England at the emigration of our
ancestors, or at the foundation of our government?   Does not
the fact that the people of the original States required an
amendment of the national Constitution, securing exemption
from prosecution, for a capital offence, except upon the indict-
ment or presentment of a grand jury, prove that, in their judg-
ment, such an exemption was essential to protection against
accusation and unfounded prosecution, and, therefore, was a
fundamental principle in liberty and justice?   By the side of
that exemption, in the same amendment, is the declaration that
no person shall be put twice in jeopardy for the same offence,
nor compelled to criminate himself, nor shall private property
be taken for public use without just compensation.   Are not
these principles fundamental in every free government estab-
lished to maintain liberty and justice?   If it be supposed that
immunity from prosecution for a capital offence, except upon
the presentment or indictment of a grand jury, was regarded
at the common law any less secured by the law of the land, or

any less valuable, or any less essential to due process of law, than the personal rights and immunities just enumerated, I take leave to say that no such distinction is authorized by any adjudged case, determined in England or in this country prior to the adoption of our Constitution, or by any elementary writer upon the principles established by Magna Charta and the statutes subsequently enacted in explanation or enlargement of its provisions.

But it is said that the framers of the Constitution did not suppose that due process of law necessarily required for a capital offence the institution and procedure of a grand jury, else they would not in the same amendment prohibiting the deprivation of life, liberty, or property, without due process of law, have made specific and express provision for a grand jury where the crime is capital or otherwise infamous; therefore, it is argued, the requirement by the Fourteenth Amendment of due process of law in all proceedings involving life, liberty, and property, without specific reference to grand juries in any case whatever, was not intended as a restriction upon the power which it is claimed the States previously had, so far as the express restrictions of the national Constitution are concerned, to dispense altogether with grand juries.

This line of argument, it seems to me, would lead to results which are inconsistent with the vital principles of republican government. If the presence in the Fifth Amendment of a specific provision for grand juries in capital cases, alongside the provision for due process of law in proceedings involving life, liberty, or property, is held to prove that " due process of law " did not, in the judgment of the framers of the Constitution, necessarily require a grand jury in capital cases, inexorable logic would require it to be, likewise, held that the right not to be put twice in jeopardy of life and limb for the same offence, nor compelled in a criminal case to testify against one's self— rights and immunities also specifically recognized in the Fifth Amendment—were not protected by that due process of law required by the settled usages and proceedings existing under the common and statute law of England at the settlement of this country. More than that, other amendments of the Con-

stitution proposed at the same time, expressly recognize the
right of persons to just compensation for private property taken
for public use; their right, when accused of crime, to be in-
formed of the nature and cause of the accusation against them,
and to a speedy and public trial, by an impartial jury of the State
and district wherein the crime was committed; to be con-
fronted by the witnesses against them; and to have compulsory
process for obtaining witnesses in their favor. Will it be
claimed that these rights were not secured by the "law of the
land" or by "due process of law," as declared and established
at the foundation of our government? Are they to be excluded
from the enumeration of the fundamental principles of liberty
and justice, and, therefore, not embraced by "due process of
law?" If the argument of my brethren be sound, those rights
—although universally recognized at the establishment of our
institutions as secured by that due process of law which for
centuries had been the foundation of Anglo-Saxon liberty—
were not deemed by our fathers as essential in the due process
of law prescribed by our Constitution; because,—such seems to
be the argument—had they been regarded as involved in due
process of law they would not have been specifically and ex-
pressly provided for, but left to the protection given by the
general clause forbidding the deprivation of life, liberty, or
property without due process of law. Further, the reasoning
of the opinion indubitably leads to the conclusion that but for
the specific provisions made in the Constitution for the security
of the personal rights enumerated, the general inhibition
against deprivation of life, liberty, and property without due
process of law would not have prevented Congress from enact-
ing a statute in derogation of each of them.

Still further, it results from the doctrines of the opinion—if
I do not misapprehend its scope—that the clause of the Four-
teenth Amendment forbidding the deprivation of life or liberty
without due process of law, would not be violated by a State
regulation, dispensing with petit juries in criminal cases, and
permitting a person charged with a crime involving life to be
tried before a single judge, or even a justice of the peace, upon
a rule to show cause why he should not be hanged. I do no

injustice to my brethren by this illustration of the principles of the opinion. It is difficult, in my judgment, to over-estimate the value of the petit jury system in this country. A sagacious statesman and jurist has well said that it was " the best guardian of both public and private liberty which has been hitherto devised by the ingenuity of man," and that " liberty can never be insecure in that country in which the trial of all crimes is by the jury." Mr. Madison observed, that while trial by jury could not be considered as a natural right, but one resulting from the social compact, yet it was " as essential to secure the liberty of the people as any one of the pre-existent rights of nature." 1 Lloyd's Deb. 430. " When our more immediate ancestors," says Story, " removed to America, they brought this privilege with them, as their birthright and inheritance, as a part of that admirable common law, which had fenced round and interposed barriers on every side against the approaches of arbitrary power." Story's Const. § 1779. I submit, however, with confidence, there is no foundation for the opinion that, under Magna Charta or at common law, the right to a trial by jury in a capital case was deemed of any greater value to the safety and security of the people than was the right not to answer, in a capital case, upon a mere information filed by an officer of the government, without previous inquiry by a grand jury. While the former guards the citizen against improper conviction, the latter secures him against unfounded accusation. A State law which authorized the trial of a capital case before a single judge, perhaps a justice of the peace, would—if a petit jury in a capital case be not required by the fundamental principles of liberty and justice—meet all the requirements of due process of law, as indicated in the opinion of the court; for such a law would not prescribe a special rule for particular persons; it would be a general law which heard before it condemned, which proceeded upon inquiry, and under which judgment would be rendered only after trial; it would be embraced by the rule laid down by the court when it declares that any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power, in furtherance of the public

good, which regards and preserves those principles of liberty and justice, must be held to be due process of law.

It seems to me that too much stress is put upon the fact that the framers of the Constitution made express provision for the security of those rights which at common law were protected by the requirement of due process of law, and, in addition, declared, generally, that no person shall " be deprived of life, liberty or property without due process of law." The rights, for the security of which these express provisions were made, were of a character so essential to the safety of the people that it was deemed wise to avoid the possibility that Congress, in regulating the processes of law, would impair or destroy them. Hence, their specific enumeration in the earlier amendments of the Constitution, in connection with the general requirement of due process of law, the latter itself being broad enough to cover every right of life, liberty or property secured by the settled usages and modes of proceeding existing under the common and statute law of England at the time our government was founded. Pomeroy's Municipal Law, 366, 372.

The views which I have attempted to express are supported by the Supreme Judicial Court of Massachusetts, in *Jones* v. *Robbins*, 8 Gray, 329, reaffirmed in *Nolan's Case*, 122 Mass. 330, 332, and in *Commonwealth* v. *Honeman*, 127 Mass. 450. Among the questions there presented was whether a statute of Massachusetts which gave a single magistrate authority to try an offence punishable by imprisonment in the State prison, without the presentment by a grand jury, violated that provision of the State Constitution which declared that " no man shall be arrested, imprisoned, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." It was held that it did.

" This clause, in its whole structure," said Chief Justice Shaw, speaking for the court, " is so manifestly conformable to the words of Magna Charta, that we are not to consider it as a newly invented phrase, first used by the makers of our Constitution ; but we are to look at it as the adoption of one of the great securities of private right, handed to us as among the liberties and privileges which our ancestors enjoyed at the time of

their emigration and claimed to hold and retain as their birth-right.

"These terms, in this connection, cannot, we think, be used in their most bald and literal sense to mean the law of the land at the time of their trial; because the laws may be shaped and altered by the legislature, from time to time; and such a provision, intended to prohibit the making of any law impairing the ancient rights and liberties of the subject, would under such a construction be wholly nugatory and void. The legislature might simply change the law by statute, and thus remove the landmark and the barrier intended to be set up by this provision in the Bill of Rights. It must, therefore, have intended the ancient established law and course of legal proceedings, by an adherence to which our ancestors in England, before the settlement of this country, and the emigrants themselves and their descendants, had found safety for their personal rights." After recognizing "law of the land" in Magna Charta and in the Constitution of Massachusetts as having the same meaning as "due process of law," and after stating that the people of the original States deemed it essential for the better security of their rights of life, liberty, and property, that their Constitutions should set forth and declare the fundamental principles of free government, Chief Justice Shaw proceeds: "Most of the State Constitutions did contain these declarations, more or less detailed and explicit; but the general purpose was to assert and maintain the great rights of English subjects, as they had been maintained by the ancient laws, and the actual enjoyment of civil rights under them. 'The sense of America was,' says Chancellor Kent, 'more fully ascertained, and more explicitly and solemnly promulgated, in the memorable Declaration of Rights of the first Continental Bill of Rights, in October, 1774, and which was a representation of all the States except Georgia. That declaration contained the assertion of several great and fundamental principles of American liberty; and it constituted the basis of those subsequent bills of rights which, under various modifications, pervaded all our Constitutional charters' 2 Kent, 5, 6.

"The right of individual citizens to be secure from an open

and public accusation of crime, and from the trouble, expense, and anxiety of a public trial, before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious, and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty."

Chancellor Kent, referring to the rights of personal security, as guarded by constitutional provisions, which were transcribed into the Constitutions of this country from Magna Charta and other fundamental acts of the English Parliament, says: "And where express constitutional provisions on the subject appear to be wanting, the same principles are probably asserted by declaratory legislative acts; and they must be regarded as fundamental doctrines in every State, for the colonies were parties to the national declaration of rights in 1774, in which the trial by jury, and the other rights and liberties of English subjects, were peremptorily claimed as their undoubted inheritance and birthright. It may be received as a proposition, universally understood and acknowledged throughout this country, that no person can be taken or imprisoned, or disseized of his freehold or estate, or exiled or condemned, or deprived of life, liberty, or property, unless by the law of the land or the judgment of his peers. The words *by the law of the land,* as used originally in Magna Charta in reference to this subject, are understood to mean due process of law, that is, by indictment or presentment of good and lawful men; and this, says Lord Coke, is the true sense and exposition of these words." And Kent immediately adds: "The better and larger definition of *due process of law* is that it means law in its regular course of administration through courts of justice."

Because of this general definition of due process of law, that distinguished jurist, it seems is claimed as authority for the present decision. When Lord Coke said that indictment or presentment was due process of law, he had reference, of course, to proceedings in cases in which, by the law of the land, that kind of procedure was required. In no commentary upon Magna Charta is it more distinctly stated than in Coke's that

informations were consistent with the law of the land in certain cases, and no one has more emphatically declared that, in capital· cases, informations are not allowed by that law and were not due process of law. He referred to indictments and present- ments to illustrate what was due process of law in prosecutions against persons accused of the higher grades of crime, and not for the purpose of giving a full definition of the phrase "due process of law," as applicable to both civil and criminal cases. The definition by Kent of "due process of law" was, therefore. better and larger, because it embraced cases civil and criminal, *in rem* and *in personam*, and included proceedings affecting every right, whether of life, liberty, or property, guaranteed by the law of the land. He was very far from saying that every proceeding, involving new methods of trial, was due process of law, because declared by the legislature to be such, or because it may be regular in the sense that it is established by a general statute.

It is said by the court that the Constitution of the United States was made for an undefined and expanding future, and that its requirement of due process of law in proceedings involving life, liberty and property, must be so interpreted as not to deny to the law the capacity of progress and improve- ment; that the greatest security for the fundamental principles of justice resides in the right of the people to make their own laws and alter them at pleasure. It is difficult, however, to perceive anything in the system of prosecuting human ·beings for their lives, by information, which suggests that the State which adopts it has entered upon an era of progress and im- provement in the law of criminal procedure. Even the statute of H. 7, c. 3, allowing informations, and, "under which Empson and Dudley, and an arbitrary star chamber, fashioned the pro- ceedings of the law into a thousand tyrannical forms," expressly declared that it should not extend "to treason, murder or felony, or to any other offence wherefor any person should lose life or member." So great, however, were the outrages perpetrated by those men, that this statute was repealed by 1 H. 8, c. 6. Under the local statutes in question, even the district attorney of the county is deprived of any discretion in the premises; for,

if in the judgment of the magistrate before whom the accused is brought—and, generally, he is only a justice of the peace—a public offence has been committed, it becomes the duty of the district attorney to proceed against him by information for the offence indicated by the committing magistrate. Thus, in California, nothing stands between the citizen and prosecution for his life, except the judgment of a justice of the peace. Had such a system prevailed in England, in respect of all grades of public offences, the patriotic men who laid the foundation of our government would not have been so persistent in claiming, as the inheritance of the colonists, the institutions and guaranties which had been established by her fundamental laws for the protection of the rights of life, liberty and property. The royal governor of New York would not have had occasion to write in 1697 to the home government that the members of the provincial legislature were "big with the privileges of Englishmen and Magna Charta." 3 Bancroft, 56. Nor would the Colonial Congress of 1774, speaking for the people of twelve colonies, have permitted, as it did, the journal of their proceedings to be published with a medallion on the title-page, "representing Magna Charta as the pedestal on which was raised the column and cap of liberty, supported by twelve hands, and containing the words '*Hanc Tuemur, Hac Nitimur.*'" Hurd on Habeas Corpus, 108. Anglo-Saxon liberty would, perhaps, have perished long before the adoption of our Constitution, had it been in the power of government to put the subject on trial for his life whenever a justice of the peace, holding his office at the will of the crown, should certify that he had committed a capital crime. That such officers are, in some of the States, elected by the people, does not add to the protection of the citizen; for, one of the peculiar benefits of the grand jury system, as it exists in this country and England, is that it is composed, as a general rule, of a body of private persons, *who do not hold office at the will of the government, or at the will of voters.* In many if not in all of the States civil officers are disqualified to sit on grand juries. In the secrecy of the investigations by grand juries, the weak and helpless—proscribed, perhaps, because of their race, or pursued by an unreasoning

public clamor—have found, and will continue to find, security against official oppression, the cruelty of mobs, the machinations of falsehold, and the malevolence of private persons who would use the machinery of the law to bring ruin upon their personal enemies. " Grand juries perform," says Story, "most important public functions, and are a great security to the citizens against vindictive prosecutions either by the government, or by political partisans, or by private enemies." Story's Const. § 1785.

To the evidence already adduced to show the necessity and value of that system, I may add the testimony of Mr. Justice Wilson, formerly of this court, and one of the foremost of the great men who have served the cause of constitutional government. He said that "among all the plans and establishments which have been devised for securing the wise and uniform execution of the criminal laws, the institution of grand juries holds the most distinguished place. This institution is, at least in the present times, the peculiar boast of the common law. The era of its commencement, and the particulars attending its gradual progress and improvement, are concealed behind a thick veil of a very remote antiquity. But one thing concerning it is certain. In the annals of the world there is not found another institution so well adapted for avoiding all the inconveniences and abuses, which would otherwise arise from malice, from rigor, from negligence, or from partiality in the prosecution of crimes." 3 Wilson's Works, 363–4.

Mr. Justice Field, referring to the ancient origin of the grand jury system in England, said, that it was, "at the time of the settlement of this country, an informing and accusing tribunal, without whose previous action no person charged with a felony could, except in certain special cases, be put upon his trial. And in the struggles which at times arose in England between the powers of the King and the rights of the subject, it often stood as a barrier against persecution in his name; until, at length, it came to be regarded as an institution by which the subject was rendered secure against oppression from unfounded prosecutions of the crown. In this country, from the popular character of our institutions, there has seldom been any contest

between the government and the citizen, which required the existence of the grand jury as a protection against oppressive action of the government. Yet the institution was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means, not only of bringing to trial persons accused of public offences upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity." 2 Sawyer, 668–9. He quoted with approval the observations of a distinguished judge to the effect that " into every quarter of the globe in which the Anglo-Saxon race have formed settlements, they have carried with them this time-honored institution, ever regarding it with the deepest veneration, and connecting its perpetuity with that of civil liberty." In their independent action," said the same jurist, " the persecuted have found the most fearless protectors; and in the records of their doings are to be discovered the noblest stands against the oppressions of power, the virulence of malice, and the intemperance of prejudice." 

We have already seen that for centuries before the adoption of our present Constitution, due process of law according to the maxims of Magna Charta and the common law—the interpreters of constitutional grants of power—which even the British Parliament with all its authority could not rightfully disregard, Cooley's Const. Lim. 175, absolutely forbade that any person should be required to answer for his life except upon indictment or presentment of a grand jury. And we have seen that the people of the original States deemed it of vital importance to incorporate that principle into our Constitution, not only by requiring due process of law in all proceedings involving life, liberty, or property, but by specific and express provision giving immunity from prosecution, in capital cases, except by that mode of procedure.

To these considerations may be added others of very great significance. When the Fourteenth Amendment was adopted, all the States of the Union, some in terms, all substantially, declared, in their constitutions, that no person shall be deprived

of life, liberty, or property, otherwise than "by the judgment of his peers, or the law of the land," or "without due process of law." When that Amendment was adopted, the constitution of each State, with few exceptions, contained, and still contains, a Bill of Rights, enumerating the rights of life, liberty and property which cannot be impaired or destroyed · by the legislative department. In some of them, as in those of Pennsylvania, Kentucky, Ohio, Alabama, Illinois, Arkansas, Florida, Mississippi, Missouri and North Carolina, the rights so enumerated were declared to be embraced by "the general, great and essential principles of liberty and free government;" in others, as in those of Connecticut, in 1818, and Kansas, in 1857, to be embraced by "the great and essential principles of free government." Now, it is a fact of momentous interest in this discussion, that, when the Fourteenth Amendment was submitted and adopted, the Bill of Rights and the constitutions of twenty-seven States expressly forbade criminal prosecutions, by information, for capital cases;* while, in the remaining ten States, they were impliedly forbidden by a general clause declaring that no person should be deprived of life otherwise than by "the judgment of his peers or the law of the land," or "without due process of law." † It may be safely affirmed that, when that Amendment was adopted, a criminal prosecution, by information, for a crime involving life, was not per- mitted in any one of the States composing the Union. So that the court, in this case, while conceding that the requirement

* Ala., 1867, Art. 1, § 10 ; Ark., 1868, Art. 1, § 9 ; Cal., 1849, Art. 1, § 8 ; Conn., 1818, Art., 1, § 9 ; Del., 1831, Art. 1, § 8 ; Flor., 1868, Art. 1, § 9 ; Ill., 1848, Art. 13, § 10 ; Iowa, 1857, Art. 1, § 11 ; Ky., 1850, Art. 13, § 13 ; Me., 1820, Art. 1, § 7 ; Mass., 1780, Pt. 1, Art. 12, as contained in *Jones* v. *Robbins*, 8 Gray 329 ; Minn., 1857, Art. 1, § 7 ; Miss., 1868, Art. 1, § 31 ; Mo., 1865, Art. 1, § 24 ; Nebraska, 1866–7, Art. 1, § 8 ; Nev., 1864, Art. 1, § 8 ; N. J., 1844, Art. 1, § 9 ; N. Y., 1846, Art. 1, § 6 ; N. C., 1868, Art. 1, § 12 ; Ohio, Art. 1, § 10 ; Penn., 1838, Art. 9, § 10 ; R. I., 1842, Art. 1, § 7 ; S. C., 1868, Art. 1, § 19 ; Tenn., 1834, Art. 1, § 14 ; Tex., 1868, Art. 1, § 8 ; W. Va., 1861–3, Art. 2, § 1 ; Wis., 1848, Art. 1, § 8.

† Geo., 1868, Art. 1, § 3 ; Ind., Art. 1, § 12 ; Kansas, 1859, Bill of Rights, § 18 ; La., 1868, Telle. 1, Art. 10 ; Md., 1867, Declaration of Rights, Art. 23 ; Mich., 1850, Art. 6, § 32 ; N. H., 1792, Pt. 1, Art. 15 ; Oregon, 1857, Art. 1, § 10 ; Vt., 1793, Chap. 1, Art. 10 ; Va., 1850, Bill of Rights, Art. 8.

of due process of law protects the fundamental principles of liberty and justice, adjudges, in effect, that an immunity or right, recognized at the common law to be essential to personal security, jealously guarded by our national Constitution against violation by any tribunal or body exercising authority under the general government, and expressly or impliedly recognized, *when the Fourteenth Amendment was adopted*, in the Bill of Rights or Constitution of every State in the Union, is, yet, not a fundamental principle in governments established, as those of the States of the Union are, to secure to the citizen liberty and justice, and, therefore, is not involved in that due process of law required in proceedings conducted under the sanction of a State. My sense of duty constrains me to dissent from this interpretation of the supreme law of the land.

MR. JUSTICE FIELD did not take part in the decision of this case.