# THE STATE v. NEIBEKIER, alias NEIGHBAKER, et al., Appellants.

**Division Two, November 22, 1904.**

1. **INFORMATION: Name of Deceased: Variance.** Although the correct name of the deceased may have been Henry or Harry Kavalsky, yet if he was usually known as and called Harry Kowallio, the variance between the proof and the information which described him as Harry Kowallio, is immaterial in a prosecution for murder.

2. **TAMPERING WITH JURY: Reports of Their Standing.** The mere fact that some unnamed person stated, while the jury were locked up in their room, that they stood "nine for murder in the first degree," with no proof that either this or any other person communicated with them, is no reason for setting aside the verdict, especially in view of the uncontradicted testimony of the sheriff that he did not leave the door and no one had opportunity to communicate with them.

3. **ALIENS: Prosecution by Information: Treaties.** Aliens, who are sojourning here, not being accredited representatives or agents of the government to which they owe allegiance, are subject to prosecution by information the same as citizens. Nor can any treaty be found between the United States and Austria guaranteeing that citizens of that country shall be prosecuted only by indictment.

4. ———: ———: **Federal Constitution.** There is nothing in the United States Constitution which deprives a State of the right to adopt and prescribe the methods of prosecuting felonies.

5. ———: ———: **Sovereignty Over Criminal Matters.** An independent State has exclusive sovereignty over its own territory, in criminal as well as civil matters, and hence it has jurisdiction to try foreigners, for instance, subjects of the emperor of Austria-Hungary, and punish them for committing murder within its borders, with the same measure of justice and according to the same forms of procedure as are accorded to its own citizens.

Appeal from St. Francois Circuit Court.—*Hon. Robert A. Anthony*, Judge.

AFFIRMED.

*R. C. Tucker* and *H. B. Ledbetter* for appellants.

(1)   Defendants were charged with the killing of Harry Kowallio. The proof on the part of the State shows that the deceased's name was Kavolsky, or Henry Kavolsky. Davis v. People, 19 Ill. 74; Penrod v. People, 69 Ill. 150; State v. Fay, 65 Mo. 490. (2)   The identity of the deceased with the party named in the indictment must be proved beyond a reasonable doubt. The name must be proved as alleged. Failure to prove the Christian name of the deceased is fatal, though this variance may be cured if the occupation and surname are proved as alleged. And when the name as proved is *idem sonans* with respect to that alleged, slight divergencies in spelling will be disregarded. Underhill on Criminal Evidence, sec. 316, p. 376. The names of the persons against whom the offense was committed, and any party whose legal existence is essential, the charge must be strictly proved as laid. 1 Arch., Criminal Pleading, note 402; Davis v. People, 19 Ill. 74; Penrod v. People, 69 Ill. 150; State v. Gabriel, 88 Mo. 631; State v. McChesney, 90 Mo. 120; State v. Clay, 100 Mo. 571; State v. Horn, 93 Mo. 190; State v. Reynolds, 106 Mo. 148. (3)   When the argument of counsel was concluded and the jury had retired in charge of H. M. Murphy, sheriff of St. Francois county, the said sheriff failed to keep the jury together; but left the jury to themselves for a long time, and wholly abandoned his charge and control, and left the courthouse and went to the jail and to a restaurant and ate his supper. During all this time the jury was left wholly out of the charge and control of the said sheriff and during the absence of the sheriff, the prosecuting attorney of St. Francois county said to H. B. Ledbetter, counsel for defendants, that a third party had told him that nine of the jury were for hanging defendants. R. S. 1889, sec. 2629. (4)   The information fails to inform defendants of the

nature and cause of the accusation against them, in this, that they are indicted for the killing of Harry Kowallio, and the name of the deceased as proved was Kavolsky, or Henry Kavolsky.  Art. 2, sec. 22, Constitution; State v. Melton, 102 Mo. 686; State v. Terry, 109 Mo. 614.

*Edward C. Crow,* Attorney-General, and *C. D: Corum* for the State.

(1)  Whether the deceased's name was Harry Kowallio, Harry Kawallio or Harry Kavalsky, is immaterial.  We concede that such a variance would be fatal at common law.  But our statute upon this subject is broad, and under it it is a question for the trial court to determine whether such a variance is material to the merits of the case and prejudicial to the defense of the defendants.  The learned trial judge declared by the eleventh instruction that such a variance between the names was immaterial.  And in doing so the court was fully warranted by the proof introduced in evidence. The State showed that the deceased was usually known by the name alleged in the indictment.  The proof conformed to the date alleged in the indictment, and the manner and means of inflicting the mortal wound, as alleged, was closely followed by the proof.  Defendants could not possibly have been misled.  But be that as it may, under our statute, the question is not for the decision of this court.  It is vested in the trial judge and it has been passed upon by him.  Under such circumstances the Supreme Court will not set aside a judgment of conviction.  R. S. 1899, sec. 2534; State v. Harl, 137 Mo. 252; State v. Sharp, 71 Mo. 218; State v. Wammack, 70 Mo. 410; State v. Barker, 64 Mo. 282; State v. Myers, 82 Mo. 562; State v. Smith, 80 Mo. 516.  (2)  It does not appear from the evidence that defendants were foreign sovereigns, or the attendants thereof.  There is no evidence that they were the ambassadors, or diplomatic agents of a sovereign.  They were not exercising

the prerogative of public minister.  In short, they were not clothed with any right which rendered them capable of committing crimes upon our soil with impunity. They come within no exception known to the international law.  They were foreigners, earning their livelihood upon our soil and are bound by the laws of our land.  They owe the same allegiance to our laws, and are liable for any infraction of them, to the same extent as our own citizens.  Certainly they should possess no more rights.  In objecting to the jurisdiction of the court, counsel stated that under the treaty existing between the United States and the Austro-Hungarian government, the defendants could not be punished.  We cannot think that this government has ever entered into a treaty with the Austro-Hungarian government, or any other, licensing its subjects to come here and commit crime at will.  In answer it may be said that defendants might be proceeded against by indictment, but cannot be proceeded against by information.  But this government will not leave it to others to frame its criminal code of procedure.  In a word, the treaty between the United States and the Austro-Hungarian government, pertaining to extradition of fugitives from justice, entered into in 1856, contains the following provisions: ''Article 3.  Whenever any person accused of any of the crimes enumerated in this convention shall have committed a new crime in the territories of the State where he has sought an asylum, or shall be found, such person shall not be delivered up under the stipulations of this convention until he shall have been tried and shall have received the punishment due to such new crime, or shall have been acquitted thereof.''  No evidence was introduced showing the terms of the existing treaty. But we assume that this court will take judicial notice of the treaties existing between this and other nations.  We do not believe that any such provisions as defendants invoke can be found.

GANTT, P. J.—On the eighth day of October, 1902, the prosecuting attorney of St. Francois county began the prosecution of the defendants for murder in the first degree of Harry Kowallio, by filing an information against them in due and approved form duly verified by his affidavit.

As the information is in all respects sufficient in form it is unnecessary to repeat it in this statement.

The defendants were arrested and afterwards, on January 15, 1903, in open court, were duly arraigned and entered their pleas of not guilty. On the sixteenth of January, 1903, a jury was duly empanelled to try the cause against all three of the defendants, and on the seventeenth day of January, 1903, the jury returned into open court their verdict finding each of the defendants guilty of murder in the second degree and assessing the punishment of each at ninety-nine years in the State penitentiary. Motions for a new trial and in arrest of judgments were filed in proper time, heard and overruled, and on the twenty-third day of January, 1903, each of the defendants were separately sentenced in conformity to the verdict. From those sentences they severally appeal to this court. The time for filing the bill of exceptions was extended by the court to August 10, 1903, and it was accordingly filed on that day.

The evidence tended to make a very simple case. The deceased and the defendants and nearly all of the witnesses were Hungarians. They lived in Hungarian Town, a section of the town of Desloge in St. Francois county. One Peter Winosky and his wife kept a boarding-house in the village. On the evening of the homicide the deceased and others were at this boarding-house, and together with the proprietor were drinking beer, and while thus engaged one of the defendants, John Neighbaker, appeared on the scene. After he had been there a short time, a controversy sprung up between Harry Kowallio and John Neighbaker about a board-bill. John commenced on Kowallio and cursed

him for not paying his board-bill, and they got into a dispute about it. This created such a disturbance that Mrs. Winosky came in from another room and requested John, one of the defendants, to leave, and because of indecent language to her she slapped him, and he returned her blow, and then the others present put him out and shut or locked the door. They marched him out. About half an hour later John Neighbaker and his two brothers, Anton and Henry, his codefendants, came back to Winosky's.

They came into the downstairs room where the witnesses were drinking beer with some others. Anton and Henry went upstairs. Harry Kowallio had preceded them and was on his bed asleep. Fifteen or twenty minutes after Henry and Anton went up to Kowallio's room, John returned and burst a window out, and came into the house in that way. He inquired for Kowallio, the deceased, and ran upstairs. All three of them then were in Kowallio's room. One of them took hold of Kowallio by the head and the other by the feet and held him down. He was asleep. He seems not to have been awakened by their handling of him. He was lying on his stomach or side, and while Henry and Anton held him, their brother John stabbed him with a long knife, about a foot or sixteen inches long. The two brothers Henry and Anton then left the room and house, and all the party except one. As John came down, he struck that witness with his fist and passed out. Several then returned and went into the room and found Kowallio had been stabbed in the side and was bleeding profusely. He died about ten minutes later. Three wounds were inflicted on Kowallio in his back, from the effects of which he died.

There was evidence that soon after the stabbing of the deceased the defendants John and Henry Neighbaker returned to their house or cabin, changed their clothing, and took a small bundle of clothes in a hand-

kerchief, and bade Anton good-bye, and left, and were afterwards apprehended in St. Louis.

Dr. English, the coroner, described the wounds he found on the body of the deceased Kowallio, and testified they produced his death. There was some evidence of loud and angry words in the room in which Kowallio was killed just prior to the stabbing; and of a tussle between Kowallio and John Neighbaker after John had been put out of Winosky's house and before he went to his home and procured the large knife with which John killed Kowallio.

There was also evidence that the deceased was named Kavalsky, and evidence that he was known and went by the name of Harry Kowallio among his associates and at the boarding-house.

The defendants offered evidence that their reputation as peaceable men in the community in which they resided was good. There was also evidence that witnesses heard noises as if a fight was going on in the house. There was also evidence that deceased was seen to shake his fist at John Neighbaker before John was put out of Winosky's house. There was evidence that the defendants came from Galicia in the empire of Austria; that they had never been naturalized or become citizens of the United States of America.

At the close of the evidence, the court instructed the jury on murder in the first and second degree, reasonable doubt, and credibility of the witnesses.

The defendants prayed the court to instruct the jury that under the pleadings and evidence they must acquit the defendants, which instruction was refused.

The defendants also prayed the court to instruct the jury that "if they believed and found from the evidence that the defendants were, on the twenty-eighth day of September, 1902, natives of Austria-Hungary and were on said day subjects of the empire of Austria-Hungary, then and in such event the court declares the law to be that the said defendants, under the treaties

existing between the United States and Austria-Hungary, are not liable to be proceeded against by information, and you must therefore render a verdict of not guilty,'' which the court refused.

The grounds of the motion for new trial will be considered in the course of the opinion.

I.    The first assignment of error is that the defendants are charged in the information with having killed and murdered Harry Kowallio, and the proof is that the name of the deceased was Henry Kavalsky, and therefore there is a fatal variance between the allegation of the information and the proof.

On this point, the court instructed the jury as follows:

''11.    Although you may believe from the evidence that the correct name of deceased was Henry or Harry Kavalsky, yet if you further find from the evidence that he was usually known or called by the name of Harry Kowallio, then such variance between the two names is not material, does not affect the guilt or innocence of the defendants, and will not be considered by you in arriving at a verdict.''

A number of the witnesses while testifying identified the deceased by the name of Kowallio, and others testified that was the name by which he was usually known among his associates and at his boarding-house.

Under these circumstances the circuit court correctly held the variance immaterial, if the jury found as a fact deceased was ordinarily known as Harry Kowallio and this was the effect of its instruction.

Section 2534, Revised Statutes 1899, provides:

''Whenever on the trial of any felony or misdemeanor, there shall appear to be any variance between the statement in the indictment or information and the evidence offered in proof thereof, in the Christian name or surname, or both Christian name and surname, or other description whatsoever, or any person whomsoever therein named or described, or in the name or de-

scription of any matter or thing whatsoever therein named or described, or in the ownership of any property named or described therein, such variance shall not be deemed grounds for an acquittal of the defendant, unless the court before which the trial shall be had shall find that such variance is material to the merits of the case and prejudicial to the defense of the defendant."

Conceding that the jury might have found that the true name of the deceased was Kavalsky instead of Kowallio, it is clear the court did not deem the variance material and the above section cures the variance in the name of the deceased if there was in fact one. [Timms v. State, 4 Coldw. (Tenn.) 138; Hunter v. State, 8 Tex. App. 75.]

II. Misconduct of the sheriff in leaving the jury out of his sight during their final deliberations is counted upon for a new trial.

This charge is based upon the affidavit of Mr. Ledbetter that, after the jury had been placed in charge of the sheriff, the sheriff left the jury entirely to themselves, and was out of their hearing, and so far away as to leave the jury open to the advances of third parties, the sheriff not being in a position to prevent the same; that, during the absence of the sheriff, the prosecuting attorney said to Mr. Ledbetter that a third person, not giving his name, stated that nine of the jury were in favor of hanging defendant.

In opposition to this, the prosecuting attorney filed his affidavit, stating that at no time did he, or any one else at his request or solicitation, communicate with the jury, or any member of it, and that he did not know from the jury or any member of it how the verdict stood or the vote taken stood.

The sheriff made affidavit that the jury were securely locked in the jury-room and no person had any opportunity to communicate with any juror or the jury during their deliberations; that he had the key to the

door of the jury-room in his possession during all the time of their deliberation and that no one else had charge of the jury and that at no time was the jury out of his charge and control.

It will be observed that it is not charged that anyone actually tampered with the jury, or sought to influence their verdict improperly or otherwise.

There is no implied inference that, because some persons not named had told the prosecuting attorney that the jury stood nine for hanging, such person had learned it from the jury. The affidavit does not charge that the jury were not properly locked up in a private room to themselves, or that they ever separated, nor that the sheriff did not have the key all the time to the room. It seems to be based on the idea that the jury was not in the sight or hearing of the sheriff. Clearly the law requires the jury to be placed in a room to themselves, out of the sight of the sheriff himself, and if he has any just conception of his duty he, no more than anyone else, has any right to listen to their conversations among themselves while endeavoring to reach a verdict. The charge is reduced to this, that after taking the jury to their room and locking them up, the sheriff left the jury in the room, and did not sit at the door all the time, but was temporarily absent, and during that time some one else could have approached the outside of the jury-room and could have communicated with them, but there is no charge that any one in fact did do so. Few verdicts would stand if the hearsay statements of outsiders as to how the jury are divided are to be received as evidence of misconduct. It is within the common experience that outsiders are prone to speculate on the verdicts of juries without the slightest evidence upon which to base their conclusions. We regard the statement of the prosecuting attorney, that he had heard the jury stood nine for conviction of murder in the first degree, as utterly

inconclusive of any misconduct on the part of any person in approaching or tampering with the jury.

The sheriff swears no one did approach the jury and no one did communicate with them, and Judge Ledbetter does not say any one did. We think upon this showing the trial court properly refused to set aside the verdict on this ground.

III. While counsel alleged, as one of their grounds for new trial, that the defendants were subjects of the emperor of Austria-Hungary, and that under the treaties between the United States and Austria the defendants could not be prosecuted by information, they saved no exception to the refusal of the circuit court to so instruct, and they have not insisted on it in their printed brief. But giving the defendants the benefit of the court's refusal of their demurrer to the evidence on that ground, to which they did save an exception, it is a necessary result of the independence and sovereignty of a State that its will shall be exclusive over its own territory, and that it may assert its authority, as a general rule, over all persons and things therein, and decide what acts shall or shall not be done within its dominion. It consequently exercises jurisdiction there, not only with respect to the members of its community and their property, but with respect to foreign persons, as to all acts at least which have been accomplished during their presence within its territory done or committed by them.

And this is true as to the enforcement of its *criminal laws* with certain universally-respected exceptions, namely, that foreign sovereigns, and members of their suites, ambassadors and accredited public ministers and diplomatic agents of foreign governments are exempt from criminal prosecutions for acts committed within the countries to which they are credited, but with these exceptions aliens are amenable to the laws of the country into which they may come and may be prosecuted for violations of its criminal laws. This is an accepted

principle of international law. [McDonald v. State, 80 Wis. 407; People v. McLeod, 1 Hill (N. Y.) 377; Ibid v. Ibid, 25 Wend. 483; Campbell v. Hall, Cowp. 208; Vattel, bk. 2, ch. 8, secs. 101, 102; Story on Conflict of Laws, 518.]

From the evidence it is conclusively apparent that these defendants were neither foreign sovereigns or the attendants thereof, nor were they ambassadors or diplomatic agents of Austria-Hungary. But it is said they are exempted from prosecution *by information,* and at any event could only be proceeded against *by indictment.* We have not been referred to the treaty or the section thereof which insures them a prosecution by indictment alone, but we have carefully examined the treaties between the United States and Austria beginning with the treaty of 1829 and the subsequent treaties of 1848, 1856, 1870 and 1871 down to 1903, and we find that by article 3 of the treaty of 1856 it is provided that "whenever any person accused of any of the crimes enumerated in this convention [referring to crimes for which citizens of the respective governments may be extradited] shall have committed a new crime in the territories of the State where he has sought an asylum, or shall be found, such person shall not be delivered up, under the stipulations of this convention, *until he shall have been tried and shall have received the punishment due to such new crime, or shall have been acquitted thereof.*"

Nowhere in any of these treaties have we been able to find any stipulation or agreement that the citizens of Austria seeking homes or employment in any State of the United States, or sojourning or travelling therein, shall be prosecuted only by indictment.

Nor is there any provision of the Federal Constitution which deprives this State of the right to adopt and prescribe the method of prosecuting crimes by information. [Hurtado v. California, 110 U. S. 516.]

An alien committing a crime in violation of our

laws is meted out the same measure of justice and according to the same forms of procedure that is accorded to our own citizens, and with this he must be satisfied. The case was well and carefully tried and the defendants have no just cause of complaint, as the record discloses they might well have been convicted of murder in the first degree.

We find no provocation which would have justified them in assaulting and brutally killing their unoffending and sleeping victim.

The said several sentences are affirmed.

All concur, except *Burgess, J.*, absent.