Frank A. **EYMAN**, Superintendent, Arizona State Penitentiary, Appellant,

v.

Robert **ALFORD**, Appellee.

No. 22274.

United States Court of Appeals
Ninth Circuit.

Feb. 24, 1969.

Rehearing Denied Sept. 28, 1971.

Merrill, Circuit Judge, dissented.

---

Jerry L. Smith (argued), County Atty., Flagstaff, Ariz., Darrell F. Smith, Atty. Gen., James S. Tegart, Asst. Atty. Gen., Phoenix, Ariz., for appellant.

W. Edward Morgan (argued), Tucson, Ariz., John H. Grace (argued), Flagstaff, Ariz., for appellee.

Before JOHNSEN,* MERRILL and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge.

This is an appeal from an order of the district court, after an evidentiary hear-

ing, granting a writ of habeas corpus on petition of appellee, under sentence of death for the crime of murder. The district court stayed its order pending disposition of this appeal. We reverse.

Appellee exhausted his state remedies by appeal to the Arizona Supreme Court (State v. Alford, 98 Ariz. 124, 402 P.2d 551), denied June 3, 1965 and Motion for Rehearing (State v. Alford, 98 Ariz. 249, 403 P.2d 806) denied June 29, 1965.

Application for Writ of Certiorari to the Supreme Court of the United States was made June 28, 1965, and on January 24, 1966, the United States Supreme Court entered the following order (Alford v. Arizona, 382 U.S. 1020, 86 S.Ct. 625, 15 L.Ed.2d 535):

> "Certiorari denied. Mr. Justice Douglas is of the opinion that certiorari should be granted."

Amended Application for Writ of Certiorari was submitted to the Supreme Court of the United States on March 14, 1966, and on June 20, 1966, the Court entered the following order (384 U.S. 1028, 86 S.Ct. 1937, 16 L.Ed.2d 1047):

> "Rehearing denied. Mr. Justice Douglas would grant the petition for rehearing, vacate the order denying the petition for a writ of certiorari and grant the petition for writ of certiorari. He would vacate the judgment below and remand the case for reconsideration in light of Miranda v. Arizona, ante, p. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694], it being impossible to say on the record whether the principles announced in that case have been violated." [1]

The following issues were set forth in the district court's memorandum of decision and passed upon by that court.

1. Was the failure to give defendant counsel at the time of his original confession a denial of his right to counsel

---

* Hon. Harvey M. Johnsen, Senior Circuit Judge, Eighth Circuit, Omaha, Nebraska, sitting by designation.

1. Mr. Justice Douglas' concern appears to have been unwarranted. As discussed in

part I of the opinion, Miranda is not applicable to this case because of non-retroactivity, even though the requirements of Miranda were apparently complied with.

and a denial of due process under the 14th Amendment to the United States Constitution?

2. Was the defendant, by reason of being denied counsel at his preliminary hearing, denied his right to counsel under the U.S. Constitution, and denied due process under the 6th and 14th Amendments to the United States Constitution?

3. Was the prosecution of the defendant by information without indictment by a grand jury a violation of the 5th Amendment of the United States Constitution?

4. Was the refusal of the trial court to set the level of criminal responsibility under either the "Durham Rule" or the Model Code of Criminal Law a denial of due process of law, a denial of equal protection of the law under the United States Constitution's 14th Amendment, or a failure to comply with the standards of the doctrine mens rea?

5. Was the denial under the applicable state laws of Arizona of the right to admit evidence of insanity less than that permitted by the M'Naghten Rule and other evidence of mitigation of punishment, a denial of equal protection of the law under the 14th Amendment to the United States Constitution?

6. Was the trial court's conduct in obtaining a psychiatric opinion concerning the condition of the defendant without the knowledge of the defendant or defendant's counsel, and without affording the defendant or his counsel the right of cross-examination, and in part determining from said extra judicial evidence the punishment of the defendant, a denial of counsel under the 6th Amendment to the United States Constitution and a denial of the right of cross-examination under the provisions of the United States Constitution providing the defendant the right to confront witnesses under the 6th Amendment of the United States Constitution?

7. Was the refusal of the trial court, prior to sentencing, of the defendant's request to change his plea from guilty to not guilty when the Court had the statement under oath of the defendant that he was not guilty, a denial of due process under the 14th Amendment to the United States Constitution?

8. Was defendant properly convicted when his court appointed counsel could not afford to contact out of state witnesses to his client's alleged innocence by reason of the fact that counsel did not have money to undertake such an investigation, in violation of the 6th and 14th Amendments to the United States Constitution?

The district court based its decision granting the writ on issues 6 & 7 above and found against appellee on the remaining issues.

Appellant (State of Arizona) on this appeal, in seeking reversal, states the issues as follows:

(A) Whether appellee was denied his rights under the 6th Amendment in being unable to confront and cross-examine witnesses in pre-sentence and sentence proceedings (Issue No. 6 before the district court).

(B) Whether it was a violation of the Due Process Clause of the 14th Amendment for the state trial court to refuse to allow appellee to withdraw his plea of guilty, prior to sentence (Issue No. 7 before the district court).

(C) Whether the district court judge erred in refusing to follow Supreme Court precedent in his interpretation of the 14th Amendment (Issue No. 6 before the district court).

Appellee states in his brief in our court that he relies upon all the contentions made before the district court. There was no cross-appeal by appellee from the adverse rulings on issues No. 1, 2, 3, 4, 5 and 8. This is probably a civil proceeding. If so, appellee may on appellant's appeal raise these issues, without a cross-appeal. Montgomery-Ward & Co. v. Duncan, 311 U.S. 243, 254, 61 S.Ct. 189, 85 L.Ed. 147 (1940); Minthorne v. Seeburg Corp., 397 F.2d 237 (9 Cir. 1968); see, Gordon Mailloux Enterprises, Inc. v. Firemen's Insurance Company, 366 F.2d 740, 741–

**310**

742 (9 Cir. 1966); Moist Cold Refrigerator Co., Inc. v. Lou Johnson Co., Inc., 249 F.2d 246 (9 Cir. 1957), cert. denied, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958).

■ Whether this habeas proceeding is or is not civil, since it involves a death penalty we will consider all the issues raised below, Nos. 1 through 8.

Appellee, now incarcerated in the county jail at Flagstaff, Arizona, pending the appeal, was charged in a criminal complaint filed July 16, 1963 in three counts of murder of three children named and aged as follows: Carol, age 14; Theodore, age 12; and Jacqueline, age 11. Their bodies had been found on June 6, 1963, one mile south of Highway 66 near Williams, Arizona. Initial investigation showed Carol had been shot four times and beaten; Jacqueline and Theodore had each been shot twice.

Appellee was arrested at Santa Rosa, California about 4:45 PM July 12, 1963. He was advised of the identity of the officers, what he was being arrested for and that he did not have to make a statement. No statement was then taken.

At about 10 PM he was interviewed by an FBI agent who fully advised him of his rights.[2] Appellee said he did not want an attorney. The following day, July 13, 1963, a polygraph examination was given to appellee at his request, and later in the day, he was interviewed after being again advised of his rights. Then on July 14, 1963, after again being advised of his rights, he confessed to the killing of the three children.

On July 14, 1963, after being advised of his rights by a California State municipal judge, appellee signed a waiver of extradiction.

Appellee was not indigent at the time of his arrest. He had $435 on his person and owned an unencumbered pick-up camper. He was returned to Flagstaff on July 16, 1963, and arraigned before a Justice of the Peace who advised him of the murder charges against him, his right to have an attorney and his right to a preliminary hearing.

A preliminary hearing was held on July 22, 1963. Appellee did not ask for an attorney nor employ an attorney though he had the assets described above. He was bound over for trial.

An information, permitted by Arizona law, was filed July 26, 1963. On July 30, appellee appeared with employed counsel and entered pleas of not guilty to each charge. Trial was set for September 9, 1963, but later continued to September 23, 1963. A hearing to determine appellee's mental ability to stand trial was later set for September 20, 1963.

The hearing, pursuant to Rule 250, Arizona Rules of Criminal Procedure, was held on the date set. Appellee and his employed counsel were present. The written reports of a Dr. Maier Tuchler, psychiatrist, and a psychologist, Dr. Aaron Cantor, were presented.

At this sanity hearing Dr. Tuchler was called as a witness for the appellee. His qualifications to testify as an expert witness in the field of psychiatry were stipulated to. He testified he had examined and interviewed the appellee, did an evaluation of his sensorium, a neurological examination, a review of the appellee's present predicament and had a past history available involving a mental illness in 1958–1959. He had before him also an evaluation of the subject's intelligence made by Dr. Cantor, Chief Psychiatrist at the Veterans Hospital, holding a Ph.D. in Psychology. He testified he was familiar with the M'Naghten Rule and that appellee could and did pass the M'Naghten Rule for sanity on the day he examined him and "on the basis of his statements to me, as of the period in May and June, during which the attacks on youngsters were alleged to have occurred;" that he was capable of assisting in his own defense; that the doctor was also familiar with the Durham Rule and that appellee would probably be considered a hospital case under the

2. The contents of the statement by the FBI agent are contained in part I of the opinion.

Durham Rule; that appellee was neurotic but not psychotic.

On cross-examination he testified appellee was not mentally defective; he was not insane; he could assist his counsel in his own defense. The reports of Drs. Tuchler and Cantor were received as part of the record in the case.

In view of the medical testimony, appellee through his employed counsel moved the state court to allow him to withdraw his pleas of not guilty and enter guilty pleas in each of the three counts. The guilty pleas were entered personally by the appellee. The state judge set sentencing for October 7, 1963 and requested the prosecutor's office to submit a full written report on the evidence that they would have offered at the trial and what they believed to be the facts of the case. The request was to be submitted to defense counsel for approval or disapproval. Likewise the defense attorney was directed to submit a written report with a copy to the prosecutor.

Attorney for appellee did not request the court, pursuant to Rule 336, Arizona Rules of Criminal Procedure, 17 A.R.S., for a mitigating or aggravating circumstances hearing. However, the court on its own conducted an investigation and inquired into the circumstances surrounding the crime.

On the basis of all the information which the court had accumulated, the sentencing judge on October 7, 1963, explained his decision and imposed the death penalty.

### I.

Appellee contends that he was denied counsel at the time of his confession and at his preliminary hearing (Issues No. 1 and 2 before the district court), and that he was denied effective assistance of counsel due to a lack of funds (Issue No. 8 before the district court) in violation of the Sixth and Fourteenth Amendments to the United States Constitution. We find no merit in these contentions.

At the hearing on the habeas petition before the district court, John F. Huber testified that he was an FBI agent and first talked to appellee at the Santa Rosa county jail on July 12, 1963. (This was the date of the arrest). He testified that Under Sheriff Clark Cole was also present and that he, Huber, advised appellee as follows: "I advised him that any statement he made to me would have to be on a voluntary basis, free and voluntary basis, that he did not have to talk to me. I advised him who I was, I was a special agent of the F.B.I. * * * I told him that he had a right to see an attorney prior to the time that he talked to me. There was a telephone on the desk. I asked him if he wanted to call right then and there to consult with an attorney, and he said that he did not. I told him that we would furnish him an attorney if he wasn't able to afford one, and he said that he had money, if he wanted one, that he would be able to get one. He said that he had nothing to hide, and therefore he didn't need to have an attorney. I told him that anything that he did say to me could later be used against him, or as testimony in a court of law. And I told him under no circumstances would I make any threats or promises to him in order to obtain a statement."

No admissions of guilt were made. The questioning was terminated. Appellee was interviewed again on July 13 and in substance the same advice previously given by the FBI agent was repeated. The interview lasted about thirty minutes.

Appellee was again interviewed on July 14 and in substance the same advice was given him by the FBI agent. On this date he signed a statement admitting the murder of the three children. Appellee read it, which took considerable time, initialed the corrections, initialed each page and at the bottom wrote that he had read these pages and signed the statement himself. Huber testified, "At the time he signed it he said, 'I have just signed my own death warrant.' That is a direct quote."

■■ From this testimony it appears that appellee's confession was properly obtained after he had knowingly, intelligently, and voluntarily waived his right to counsel. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694 (1966) and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), are not applicable to this case since they are not retroactive to October 7, 1963, the date of the sentencing of appellee, Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Moreover, since appellee plead guilty the confession was never used against him. We find no prejudice or violation of constitutional rights due to the lack of counsel at appellee's original confession.

■ Appellee was again advised of his rights at the preliminary hearing, but chose to proceed without counsel. He suffered no prejudice as a result. White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) has no application to this case since appellee plead not guilty at the preliminary hearing, and, furthermore, the preliminary hearing is not a "critical stage" of the proceedings under Arizona law. State v. Garaygordobil, 89 Ariz. 161, 166, 359 P.2d 753 (1961). Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) is also not applicable since the preliminary hearing in Arizona is not an arraignment. State v. Coursey, 71 Ariz. 227, 225 P.2d 713 (1950); State v. Thomas, 78 Ariz. 52, 275 P.2d 408 (1954), cert. denied, 350 U.S. 950, 76 S.Ct. 326, 100 L.Ed. 828 (1956). Appellee's constitutional rights were not violated by the absence of counsel at his preliminary hearing.

■ We do not pass on whether insufficient funds *to properly prepare for trial* could result in a denial of effective assistance of counsel in violation of the Fourteenth Amendment, since this question is not present in the case before us. Our study of the record in this case and the facts surrounding appellee's *guilty plea* convince us that he was not denied effective assistance of counsel due to a lack of funds. Appellee was not indigent at the time of his arrest; he retained counsel; and he chose, with advice of counsel, to admit his guilt. Thus, no funds were required to prepare a defense to the charges against him.

II.

■ Appellee contends that he was denied due process because he was prosecuted on an information filed by the district attorney rather than on a grand jury indictment (Issue No. 3 before the district court). There is no merit in this contention. The Supreme Court specifically approved prosecution by information in Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232 (1884), and that decision has been followed ever since. Morford v. Hocker, 394 F.2d 169 (9 Cir. 1968), and cases cited therein. We so held in Sims v. Eyman, 405 F.2d 439 (9 Cir. 1969).

III.

■ Appellee contends that Arizona's use of the M'Naghten rule as the test for mental competence violates the Fourteenth Amendment to the United States Constitution (Issue No. 4 before the district court). We do not agree. Both the United States Supreme Court and this Court have permitted the use of the M'Naghten rule, and we adhere to that position now. Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); Sauer v. United States, 241 F.2d 640 (9 Cir.), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957); Ramer v. United States, 390 F.2d 564 (9 Cir. 1968).

IV.

■ Appellee contends that the Arizona sentencing procedure in murder cases, which does not allow evidence solely in mitigation of punishment to be presented to a jury, violates due process, equal protection, and the right not to plead guilty and demand a jury trial (Issue No. 5 before the district court).

We considered at length and rejected this same attack in Sims v. Eyman, 405 F.2d 439 (9 Cir. 1969). The legal basis

for the attack here is identical to the attack in *Sims*. The factual basis here is generally the same except that appellee here (the prisoner) contends a judge could under Arizona procedure, hear evidence of mental incompetency which would not qualify under the M'Naghten test and so would not be admissible before an Arizona jury; and that thus a defendant must plead guilty to be able to present such evidence. What we have held in *Sims* disposes of this issue.

## V.

Appellee contends that he was denied the right to confront and cross examine witnesses in the presentence and sentence proceedings in violation of the Sixth and Fourteenth Amendments to the United States Constitution (Issue No. 6 before the district court). The district court found in appellee's favor on this contention. We disagree.

The Arizona Rules of Criminal Procedure, Rules 336 and 187 [3] permit a judge to obtain and consider evidence relevant to proper sentencing which may have been inadmissible before the jury on the issue of guilt. The witnesses involved in producing this evidence are not subject to confrontation and cross examination by the defendant. In this case, the sentencing judge obtained additional information on appellee's mental competence and other matters in order to determine what punishment should be prop-

erly imposed. Appellee contends that this procedure violated his constitutional rights. The sentencing judge, Judge Wren, obviously appreciated the gravity of his responsibility following appellee's pleas of guilty. He expressed his preference for a jury decision as to the sentence which should be imposed. He allowed several weeks before passing sentence so that he could study the reports submitted by both sides and consider all relevant information. Accordingly, he discussed the facts of the case with the investigating officers and learned that bullets had been fired into the hearts of the children after they had already been shot. Since this evidence raised doubts in his mind about appellee's mental condition, he talked to Dr. Tuchler, who had testified at appellee's sanity hearing. Dr. Tuchler stated to the judge that this evidence was not indicative of mental incompetence, but rather was the act of a calculating mind intent on destroying anyone who might later testify.

Appellee contends that the consultation with Dr. Tuchler for additional information was in reality an extension of the Rule 250 sanity hearing, and that the answers given by Dr. Tuchler were in violation of appellee's right to confront and cross examine witnesses against him.

It is clear from the Rule 250 hearing of September 20th that appellee was not legally insane under the M'Naghten test employed by Arizona and that

3. Arizona Rules of Criminal Procedure, Rules 336 and 187 read:

"Rule 336. Inquiry into mitigating and aggravating circumstances. When the court has discretion as to the penalty to be inflicted on the defendant, it shall, upon suggestion of either party that there are circumstances which may properly be taken into consideration, hear evidence as to the circumstances summarily in open court, either immediately or at a special time and upon such notice to the adverse party as the court directs, or the court may inquire into such circumstances of its own motion."

"Rule 187. Determination of punishment on a plea of guilty. When the defendant pleads guilty to an indictment or information, if the court accepts the

plea and has discretion as to the punishment for the offense, it may hear witnesses to determine what punishment shall be imposed."

Rule 336 has been broadly interpreted in Arizona. The "circumstances" mentioned therein are not limited to extenuating circumstances immediately surrounding commission of the offense but include any type of information, both favorable and unfavorable, about the defendant's background and character. The judge assessing punishment is not bound by rules of evidence in hearing evidence to determine punishment and he may consider many matters in mitigation or aggravation which would be inadmissible on the issue of guilt or innocence. *State v. Levice*, 59 Ariz. 472, 130 P.2d 53 (1942).

he was competent to stand trial. The judge, in consulting Dr. Tuchler, was not seeking additional information to determine appellee's competence to stand trial, but rather was seeking additional information concerning the proper sentence to be imposed. Thus, the information, which presented an aggravating circumstance, was part of a presentence investigation permitted by Arizona law. Such information could be relied on by the judge in passing sentence and was not subject to confrontation and cross examination by appellee.

The Sixth Amendment guarantees the right to confront opposing witnesses, including the right to cross examine, in all criminal prosecutions, and this guarantee is made binding on the states through the Fourteenth Amendment by Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), which apparently is fully retroactive, see, Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). However, this guarantee does not apply to evidence obtained in presentence and sentence proceedings.

We believe the case of Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) is controlling here. In that case the trial judge, contrary to the jury's recommendation, imposed the death penalty on the defendant largely in light of additional information contained in the presentence report which was inadmissible before the jury. Under New York law, the judge could consider such information even though it was obtained outside the courtroom from persons whom the defendant had not been permitted to confront or cross examine. The Supreme Court stated that this procedure was proper since the judge in sentencing need not be bound by the strict rules of evidence applicable to the trial. The Court concluded (337 U.S. at 250–252, 69 S.Ct. at 1084, footnotes omitted):

> "We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life. The type and extent of this information make totally impractical if not impossible open court testimony with cross-examination. Such a procedure could endlessly delay criminal administration in a retrial of collateral issues.

> The considerations we have set out admonish us against treating the due-process clause as a uniform command that courts throughout the Nation abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence. New York criminal statutes set wide limits for maximum and minimum sentences. Under New York statutes a state judge cannot escape his grave responsibility of fixing sentence. In determining whether a defendant shall receive a one-year minimum or a twenty-year maximum sentence, we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts—state and federal—from making progressive efforts to improve the administration of criminal justice.

> It is urged, however, that we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed. We cannot accept the contention. Leaving a sentencing judge free to avail himself of out-of-court information in making such a fateful choice of sentences does secure to him a broad discretionary power, one susceptible of abuse. But in considering whether a rigid constitutional barrier should be

created, it must be remembered that there is possibility of abuse wherever a judge must choose between life imprisonment and death. * * * We cannot say that the due-process clause renders a sentence void merely because a judge gets additional out-of-court information to assist him in the exercise of this awesome power of imposing the death sentence."

The *Williams* case has been adhered to by the Supreme Court and followed in the circuits. See Williams v. Oklahoma, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); and United States v. Fischer, 381 F.2d 509 (2 Cir. 1967).

The sentencing procedure is not immune from scrutiny under the due process clause. Williams v. New York, supra, at 252, n. 18, 69 S.Ct. 1079. However, appellee's reliance on Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) is misplaced. The record in this case, unlike that in *Townsend,* does not indicate that the sentencing judge relied on assumptions which were materially untrue. On the contrary it appears that Judge Wren made every attempt to secure full and accurate information concerning the proper sentence in this case. Moreover, the judge disclosed the information upon which the sentence was based, as was done in *Williams,* supra, at 244, 69 S.Ct. 1079. Thus Verdugo v. United States, 402 F.2d 599 (9 Cir. 1968), has no application to this case since the information was not obtained in violation of any constitutional right and the information was disclosed to appellee and his counsel.

We therefore hold that the presentence and sentence proceedings did not result in any violations of appellee's rights under the Sixth and Fourteenth Amendments.

## VI.

Appellee contends that it was a denial of due process under the Fourteenth Amendment to the United States Constitution for the trial court to refuse to allow him to withdraw his plea of guilty prior to sentencing (Issue No. 7 before the district court). The district court also found in appellee's favor on this contention. Again, we disagree.

It appears that appellee, with advice of counsel, realized that his crime was so aggravated and the evidence against him so overwhelming that he would almost certainly be convicted and sentenced to death if he chose to contest his guilt before a jury. Appellee apparently hoped that he would be found unfit to stand trial. After the evidence produced at appellee's Rule 250 sanity hearing showed him to be mentally competent under Arizona law, appellee, with advice of counsel, decided to withdraw his plea of not guilty and enter a plea of guilty to each count.

Appellee contends that he expected the sentencing judge to impose life imprisonment, rather than the death penalty, on the basis of the psychiatric testimony produced at the sanity hearing. On the day set for sentencing, appellee, through his counsel, discovered that the judge had decided to impose the death penalty. Understandably, appellee sought to withdraw his plea of guilty to avoid death. However, except for a self-serving claim of innocence, appellee offered no legitimate basis to justify withdrawing his plea. The judge, exercising his sound discretion under Arizona law, refused to allow withdrawal of the plea.[4]

4. The judge explained his decision as follows: "Mr. Alford, subsequent to your arrest and prior to this hearing, you were given every legal avenue that this court considered; and on your application and the application of your attorney, pursuant to your request, the matter was set for jury trial. * * * I, myself, signed innumerable—I don't know how many—subpoenaes, mandates to bring witnesses, in from other states. Large sums were expended, under this court's order, for expense money for those witnesses. All of this was cancelled when you entered a plea of guilty prior to the date set for trial. To allow you to with-

Rule 188 of the Arizona Rules of Criminal Procedure provides as follows:

"The court may in its discretion at any time before sentence permit a plea of guilty to be withdrawn and, if judgment of conviction has been entered thereon, set aside such judgment, and allow a plea of not guilty, or, with the consent of the county attorney, allow a plea of guilty of a lesser included offense, or of a lesser degree of the offense charged, to be substituted for the plea of guilty."

 This rule has been interpreted on many occasions by the Arizona Supreme Court. Under Arizona law, there is no absolute right to withdraw a plea of guilty before sentencing. Rather, the motion to withdraw a plea is addressed to the sound discretion of the trial court, and in the absence of clear abuse of that discretion the court's ruling will not be disturbed on appeal. Even though the trial court's discretion should be liberally exercised in favor of permitting withdrawal, there must be some showing that justice will be thereby served. State v. Wilson, 95 Ariz. 372, 390 P.2d 903 (1964); State v. Valenzuela, 98 Ariz. 189, 403 P.2d 286 (1965). It is not sufficient to merely show that a defendant has changed his mind where he was advised by counsel, understood the proceedings, was not improperly coerced, and where there was no mistake or misapprehension concerning possible consequences of the plea. State v. Norgard, 92 Ariz. 313, 376 P.2d 776 (1962). Moreover, as the court pointed out in State v. Alford, 98 Ariz. 124, 131–132, 402 P.2d 551, 556 (1965):

" 'An experienced appraisal of the available evidence frequently indicates that the chance of a successful defense is negligible. The defense attorney may then be serving his client best by advising him to plead guilty and to bargain for the most lenient treatment possible. *To counsel this strategy is not to advise inadequately, even if the expectation of leniency is subsequently disappointed.*' (Emphasis supplied.) Comment, Assistance of Counsel, 7[8] Harv.L.Rev. 1434, 1441, (May 1965). And see Monroe v. Huff, 79 U.S.App. D.C. 246, 145 F.2d 249 (1944)."

The federal standard on withdrawal of a guilty plea is also discretionary under Rule 32(d) of the Federal Rules of Criminal Procedure, 18 U.S.C. In United States v. Ptomey, 366 F.2d 759, 760 (3 Cir. 1966), the Court of Appeals for the Third Circuit stated:

"The withdrawal of a plea of guilty is not a matter of right. A motion for leave to withdraw a plea of guilty and substitute a plea of not guilty is addressed to the sound discretion of the court and should be denied if the defendant knew and understood what was being done and there were not present any circumstances of force, mistake, misapprehension, fear, inadvertence or ignorance of his rights and understanding of the consequences of his plea. * * *"

See also, Miller v. United States, 351 F.2d 598 (9 Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966).

There is no substantial evidence that appellee was not, in fact, guilty as charged. It is apparent from the record that appellee was fully protected by the trial court when he changed his plea to guilty; that he knew and understood what was being done; that he had fully discussed this decision with competent counsel and was fully advised by such counsel; that he was well aware of the possible consequences of his plea; that he was not co-

---

draw the plea at this date, after the County Attorney's office has laid before this court, pursuant to the order of this court, all of the evidence in their possession, would not only constitute a manifest injustice to them but to the public, I feel it would be a precedent extremely dangerous in criminal law.

Every defendant, henceforth, could enter a plea of guilty before the trial date to stop the trial proceedings, and could secure our pre-sentence reports and, on request made to the court, all of the evidence in the County Attorney's hands. I do not believe that this can be or should be the law."

erced by force, fear, or fraud; and that he was not acting from inadvertence, mistake, or misapprehension.

■ Appellee contends that he was under the mistaken impression that the testimony produced at his sanity hearing would qualify as mitigating evidence which would result in a lesser sentence. This belief was nothing more than an expectation of leniency. Under Arizona law, the sentencing judge could and did obtain additional information which led him to impose the death penalty. The failure of appellee's expectation to materialize is not the kind of mistake or misapprehension which would justify allowing a guilty plea to be withdrawn.

Appellee also contends that he did not have an opportunity to confront and cross-examine the sources of the court's additional information. This contention has been dealt with above in part V of the opinion; it also is not sufficient to justify allowing withdrawal. See, Hoover v. United States, 268 F.2d 787 (10 Cir. 1959).

Appellee relies on our decision in Jones v. Eyman, 353 F.2d 528 (9 Cir. 1965), where the court found a denial of due process based on the totality of circumstances surrounding the trial court's refusal to allow a guilty plea to be withdrawn. Appellee's reliance is misplaced. In *Jones*, the defendant repeatedly complained about lack of counsel and was denied counsel; he made incriminating statements after being denied counsel; and he plead guilty directly contrary to the advice of counsel. None of these circumstances, indicating a denial of due process, appear in the record in appellee's case.

On the record before us, we cannot say that the trial court's refusal to allow appellee to withdraw his plea of guilty was an abuse of discretion or a denial of due process.

The judgment of the district court is reversed and the case remanded with instructions to deny relief on the habeas petition.

MERRILL, Circuit Judge (dissenting):

I dissent and would affirm the judgment of the District Court. My difference with the majority relates to part V of its opinion. In other respects I concur.

In my judgment it was a denial of due process in violation of the Fourteenth Amendment for the sentencing judge, in imposing the death penalty, to resolve crucial factual disputes on the basis of statements made to him by persons not under oath and not subject to confrontation of petitioner or to his cross-examination.

In two respects I distinguish other types of cases, reserving judgment as to the rule that should today apply in such cases.

1. *Sentences Other Than Death*

I readily accept the fact, emphasized by the majority, that the sentencing function ordinarily is quite different in its nature from that of the ascertainment of guilt. Further, I concede that these differences may well justify application of a different standard in the determination of what constitutes due process.

The legislatively fixed and mandatory sentence is becoming a rarity. Sentencing today (together with the modifications permitted by probation and parole proceedings) involves more than a ceremonial pronouncement of what the legislature has prescribed as fitting punishment. It involves an informed exercise of discretion, essentially administrative, in determining how, in the interests of society, the prisoner should be treated. In this respect Williams v. New York, 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (relied on by the majority), notes, "Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." Certainly in the twenty

years since *Williams* the emphasis in this direction has increased.

It is to this essentially administrative determination as to manner of treatment, where the defendant has already with due process been tried for his liberty, that the due process question of what constitutes fundamental fairness in the sentencing procedures is directed.[1]

In this setting the death penalty subsists as an anomaly. It does not contemplate correction or treatment. It is an outright rejection of such aims. It is instead total retribution.

Today it cannot be said that the death penalty is the norm for first degree murder and that the choice of life imprisonment is an act of clemency based on mitigating circumstances. It is common knowledge that the choice of death is not the rule but the exception and apparently is reserved for cases where the homicidal malice is found to be not only unmitigated but aggravated.

The death sentence, then, is not to be likened to the administrative determinations upon which sentencing, probation or parole decisions are ordinarily founded. On the contrary it is the most awesome of truly judicial responsibilities: an adjudication of guilt of aggravated and unmitigated first degree murder. It is at the sentencing hearing that the defendant goes on trial for his life.

Facts which, where a lesser sentence is involved, may be relevant solely to the question of treatment (e. g., prior criminal record, family or social background, history of mental illness) here can become relevant to the aggravation/mitigation issues and thus bear on the quality or quantum of guilt. If factual disputes are presented in these respects the constitutional standards of due process appropriate to the ascertainment of guilt should, then, apply in their resolution.

2. *Cases Not Involving Disputed Facts*

Williams v. New York, supra, on which the majority relies, was not concerned with factual disputes respecting matters of mitigation or aggravation.[2] It was concerned primarily with whether due process required that the rules of evidence fashioned for trial should apply to the sentencing procedures. It dealt with problems of competence and relevance.

Here the crucial factual issue at the time of sentencing as tendered by the defendant was whether his criminal acts were the product of mental illness or defect.[3] This issue was resolved against

1. That real problems remain in defining sentencing due process is made clear by this court's opinion in Verdugo v. United States, 402 F.2d 599 (9th Cir. 1968).

2. The court states at 337 U.S. 244, 69 S.Ct. 1081:
 "The accuracy of the statements made by the judge as to appellant's background and past practices were not challenged by appellant or his counsel, nor was the judge asked to disregard any of them or to afford appellant a chance to refute or discredit any of them by cross-examination or otherwise."

3. Insanity had been the crucial issue from the start. At the outset the defendant had pleaded not guilty, giving notice pursuant to Arizona procedure of his intention to show evidence of insanity. He had a history of mental illness, and had at one point been committed to the California State Mental Hospital at Stockton, California. The court ordered a sanity hearing to determine his competence to stand trial. At that hearing, as the majority opinion notes, Dr. Tuchler was called by the defendant and testified that in his opinion the defendant was sane under Arizona law (the M'Naghten Rule) and competent to stand trial; still "he would probably be a hospital case under the Durham rule." I take this to be an expression of the opinion that the defendant's criminal acts were the product of his mental defect. Immediately following this testimony, "in light of the doctor's testimony," the defendant changed his plea to one of guilty.

the defendant on the basis of out-of-court statements made to the judge.[4] For the reasons stated I regard this as a denial of due process.

4. In imposing sentence the judge stated: "I cannot understand, Mr. Alford, what possesses a man, that he can kill three defenseless children; that he can methodically, after shooting them, walk around to each of the bodies and place another bullet through the heart of each, while they are lying dead or dying on the ground * * * I did not learn of this, this factor of this case, until after you entered your guilty plea and I discussed the matter with the investigating officers, in attempting to find out what all the facts in this case were, in order that I could arrive at what I felt to be a just decision. As I stated, I did not until then learn of the fact that beneath each of the bodies they found a 45 caliber bullet on the ground."

The judge stated that he was so disturbed by the facts he had ascertained from the investigating officers that he had called Dr. Tuchler in Phoenix and informed him of the new evidence and that the doctor had changed his opinion respecting applicability of the Durham rule. In the light of the new facts the doctor now stated that "it was not any mental deficiency that caused the firing of the 45" but that "this was the act of a cold, calculating mind anxious to destroy anyone who might later testify against him."