**Karl Hines NARTEN, Appellant,**

v.

**Frank A. EYMAN, Superintendent of Arizona State Penitentiary, Appellee.**

**No. 22249.**

United States Court of Appeals
Ninth Circuit.

April 15, 1969.

Rehearing Denied June 13, 1972.

William H. Tinney (argued) and W. Edward Morgan, Tucson, Ariz., for appellant.

Carl Waag (argued) Asst. Atty. Gen., Darrell F. Smith, Atty. Gen., Gary K. Nelson, Asst. Atty. Gen., Phoenix, Ariz., for appellee.

Before POPE*, HAMLEY and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge.

This is an appeal from a judgment of the district court, after hearing, denying a writ of habeas corpus sought by a state prisoner awaiting execution for the crime of murder, and serving a life sentence for the crime of assault with intent to commit murder. We affirm.

The appeal presents the following questions:

1. Did publicity, prior to and during the trial, deprive the appellant of a fair trial and an impartial jury in the trial of his case?

2. Was the prosecution of appellant, by information without an indictment by

---

* Hon. Walter L. Pope died March 27, 1969. He participated in the case, heard argument and voted to affirm the judgment of the district court. He did not see this opinion.

a grand jury, a violation of the Fifth Amendment of the United States Constitution?

3. Was there a denial of due process, equal protection, and the right not to plead guilty and demand a jury trial, where the state jury has the power to assess the death penalty in a capital case without hearing evidence solely in mitigation of punishment, while on a guilty plea to a state judge the court may hear such evidence?

4. Was the exclusion, under the M'Naghten rule, of expert testimony concerning appellant's alleged diminished mental capacity a violation of due process?

5. Was there a violation of a privileged communication between appellant and his wife, and was the statement inadmissible due to lack of counsel?

Appellant, Karl Hines Narten, now imprisoned in the Arizona State Prison at Florence, Arizona, was charged in an information with first degree murder and assault with intent to commit murder. He went to trial on May 14, 1963, and was convicted of both counts by a jury which fixed the punishment for murder at death. On May 31, 1963, appellant was sentenced to be executed for the murder conviction and sentenced to life imprisonment for the assault conviction. Appellant's convictions and sentences were affirmed by the Arizona Supreme Court, State v. Narten, 99 Ariz. 116, 407 P.2d 81 (1965); the United States Supreme Court denied his application for writ of certiorari, Narten v. Arizona, 384 U.S. 1008, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966).

Appellant thereafter filed a petition for writ of habeas corpus with the Arizona district court. The district court held a hearing, considered the evidence, and on June 20, 1967, denied the writ. Appellant now appeals.

On January 31, 1963, Rickel Hanson and his fiance Patricia Crosby were hiking in a remote area near Tucson, Arizona. As they were returning to their car, they had to pass an area where appellant was standing with a rifle in his hand. Hanson greeted appellant, who then shot him eight times, causing his death. Appellant then ordered Crosby to accompany him, threatening to kill her if she did not behave. He made several sexual advances to her; when she refused to co-operate, he shot her in the head and left. She recovered and identified appellant as her assailant and as the person who had killed Hanson.

## I.

### FAIR TRIAL AND IMPARTIAL JURY

The command of the Sixth Amendment for a trial by an impartial jury is made applicable to the States through the Fourteenth Amendment, Parker v. Gladden, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). The United States Supreme Court has considered state convictions, where pretrial and trial publicity was present, under the Due Process clause of the Fourteenth Amendment. Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). This court recently considered the problem of pretrial and trial publicity in Silverthorne v. United States, 400 F.2d 627 (9 Cir. 1968).

#### (a) Pretrial Publicity

Appellant argues that there was extensive publicity immediately following the commission of the crimes on January 31, 1963 and until the capture of appellant six days later. But appellant states the publicity "diminished gradually, although still comprehensive and extensive, until the conclusion of appellant's preliminary hearing on February 28, 1963. * * * During the months of March and April when appellant was awaiting trial, the publicity in the communication media dropped off to an insignificant degree."

This publicity appeared in newspapers, magazines, TV and radio. A record of this publicity was made be-

fore the state trial judge and was amplified in the hearing before the district court on the habeas corpus petition.

Three pulp magazines, two with dates of May and one of June 1963 contained purported factual accounts of the case. There were three editorials in local papers. On February 18, 1963, an editorial, "Pampering Criminals—Can be Criminal Neglect," urged capital punishment. On March 8, 1963, an editorial, "Crime, Punishment—and More Crime," urged that punishment in criminal cases be quick and certain. On May 12, 1963, an editorial, "Jurist Shows Excellent Reasoning," commented on a death sentence imposed by a California judge. None of the three mentioned appellant or his case.

In the early publicity, there were references to matters of which appellant now particularly complains,[1] but as the district court judge pointed out, these items appeared long before trial. It does not appear that defense counsel questioned any prospective juror about them during the voir dire.

■ Motions for change of venue and continuances were made *prior* to the voir dire of the jury panel. The motions were denied. The denial of a motion for a continuance

> "was in the sound discretion of the trial court and a denial of such a motion, prior to the voir dire examination, is not an abuse of that discretion. United States v. Medlin, 353 F.2d 789 (6 Cir. 1965), cert. denied, 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed. 2d 683, reh. denied, 385 U.S. 889, 87 S.Ct. 14, 17 L.Ed.2d 123 (1966)."

Silverthorne v. United States, supra, p. 634. We think the same rule applies as well to the motion for change of venue. The effect of pretrial publicity can be "better determined after the voir dire examination of the jurors." United States v. Medlin, 353 F.2d 789, 792 (6 Cir. 1965), cert. denied 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683.

(b) *The Voir Dire Examinations*

The voir dire examination was conducted first by the judge in very general terms and then by the prosecution and defense in turn, with questions to the individual jurors. The voir dire was exceedingly fair. Although some objections were sustained as to the form of defense questions and as to questions involving insanity, in no instance were defense counsel limited in the length of time taken by their examination, nor in the scope of their questions concerning what publicity the jurors had heard, seen or read. During their examination the defense counsel controlled the subject matter and the extent of questioning; they made no request to interrogate any juror in the absence of the other jurors.

After the voir dire was completed, and before the exercise of peremptory challenges, a motion for a continuance and a change of venue was again made. Such motions were made again after the state had concluded its case and the defense had begun to present its witnesses. Appellant renewed all motions after the presentation of the case by prosecutor and defense. They were again denied.

The voir dire took two and one-half days and covered 586 pages of transcript. Included were defense motions and other proceedings out of the presence of the prospective jury.

The prospective jurors, in response to inquiries as to what they recalled as to publicity from newspaper or TV, gave replies like "It's some time ago" or "It's dim in my mind" or "I couldn't tell you the details" or "I can't even recall the

---

1. Appellant's prior criminal record, including attempted rape, burglary and writing a bogus check. 2. That he was considered a suspect in another unsolved double slaying. 3. That he had been questioned about "waiving a gun" at a young couple in the mountains near Tucson. 4. He was described as having belonged to the Hitler Youth in Germany. 5. Miss Crosby was reported as saying, "I'll never forget that face."

headlines." Several, knowing they were on a jury panel, stated they had made a conscious effort to avoid hearing or reading about the case. Others had working hours that left little time for conversation, reading or watching TV.

A total of 49 prospective jurors were questioned before peremptories were exercised; an additional 11 were examined in order to secure the 2 alternates.

Under the Arizona practice, the voir dire continues until 32 prospective jurors have been passed for cause. The peremptory challenges not exceeding 10 to a side, are then exercised and the first 12 jurors remaining become the jury panel. The transcript of the voir dire of the 32 prospective jurors passed for cause, shows that only a few were asked if they had read the editorials; all those to which the question was addressed, said they had not.

Similarly, only certain jurors were asked if they had seen or read the pulp magazines; all of whom inquiry was made stated they had not.

Of the 12 who eventually constituted the jury, 8 stated they had formed no opinion; 2 said they had formed previous opinions but did not have them at the time of questioning. The record is uncertain as to whether the remaining 2 had previously formed opinions; however, they had none at the time of the voir dire.

Midway through voir dire defense counsel challenged seven prospective jurors for cause on the ground they had previously formed an opinion as to the guilt or innocence of the appellant. The motion was denied. The challenge described the seven jurymen by number and not by name. Appellant contends that jurors Linner, McClure and Hardman were among the seven challenged, but were allowed to remain on the panel and sat on the case; this he contends constituted prejudicial error.

An examination of the voir dire transcript reveals that Hardman had not yet been examined at the time the above challenge was made; therefore, she could not have been included in the group of seven. The record clearly shows that no challenge for cause was ever made to her presence on the jury.

We have been unable to ascertain from the record if Linner and McClure were among the seven challenged for cause as a group. We assume for purposes of discussion that they were and find no error of constitutional proportions in the court's refusal to sustain the challenge as to them.

Linner was a college graduate, the wife of a city councilman. She had originally formed an opinion but "did not have one now."[2] McClure, a housewife, had at one time a "slight" opinion but "no definite opinion." She had none at time of questioning. Each stated they could lay aside what they had read or heard about the case and base their verdict on the evidence received in court.

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of

2. In fact as to Linner and four other jurors who sat on the case defense counsel at the end of his questioning stated, "I will accept this juror." In other cases he stated, "I pass this juror." Of course this was the part of the case involving voir dire for cause; the peremptory challenges were yet to come. We treat the "acceptance" as passing for cause. However, in view of the particular voir dire of these five jurors, the words, "I will accept this juror" probably indicated at least a subconscious satisfaction with the juror on the part of defense counsel. Most, if not all of the five had answered certain questions in a manner which would indicate they would be good jurors from a defense standpoint.

any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

■ We think that the pretrial publicity did not deprive appellant of a fair trial or an impartial jury. The publicity concerned commission of the crime, the escape to Mexico and the capture. There was no publicity concerning the matter of punishment, except the editorials referred to above. No juror, questioned about them, had read or seen them. There was no real issue as to whether appellant had killed the deceased.[3] The ultimate question was whether or not the jury would impose the death penalty; the major defense was that appellant was insane.

The voir dire was conducted in part by defense counsel. They were not limited in questioning as to the pretrial publicity. No juror who sat on the panel had read the pulp magazines. The pretrial reports were admitted by appellant to have been factual.

The voir dire failed to show that appellant did not have an impartial jury and could not receive a fair trial. Therefore, the defense motions for a continuance and for change of venue made subsequent to the voir dire were properly denied.

(c) *Trial Publicity*

The publicity during the trial was admitted by appellant to be factual. Both Estes v. Texas, 381 U.S. 532, 541–542, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) have spoken of the right of a reporter to write of what transpires during a trial.

At the commencement of the voir dire, the trial court was of the opinion that the jury was to be fully sequestered as provided for in Rule 268, Rules of Criminal Procedure, 17 A.R.S. This sequestration is mandatory if requested by either counsel or the defendant himself. Although the record does not reflect when, how, or why—this order was apparently modified to require sequestration only during the daytime hours when the trial was actually in progress. No objections of record by appellant or his counsel to this procedure were made during the trial; in fact the procedure was consented to by experienced defense counsel.

The court repeatedly told the jury not to converse with anyone or permit others to converse with them, and to report to the court any such instance if it occurred. The trial judge also repeatedly cautioned the jurors to "Try not to let any outside source bring the case to your attention, such as newspaper or radio or TV or other news media." There was never any objection to the court's cautionary instructions nor any request for more extensive or firmer instructions.

All witnesses were placed under what the state trial judge termed "The Rule." They were told that they were not to di-

3. Appellant's counsel, at the argument in this court, stated in substance, "There was no big issue as to whether appellant killed the deceased, the issue was on the question of punishment." In his closing argument to the jury, he stated, "I don't want to insult the intelligence of this jury * * * by telling them that there certainly is not ample evi- dence that Karl Narten did the killing and the other things out there." Appellant's brief states, "The defense pleaded insanity * * * it could be argued by appellee that as to the fact of the shooting, there was not that sort of doubt which would be affected by pretrial publicity."

vulge what their testimony "is or may be;" not to discuss the case among themselves or with any one else except the attorneys, and then, only in private with an attorney without any other persons present. At no time *during* the trial or after the verdict was any request ever made to question the jurors *in camera* as to the effect of any publicity upon them.

We conclude that the publicity during the trial, presents no problem whatsoever. Appellant admits the reporting of the trial proceedings was factual; no showing was made that any particular item of publicity came to the attention of the jury; no motion or request was made to interrogate jurors *in camera*, and although defense counsel and the appellant himself had the right to request complete sequestration of the jury, no such motion or request was made.

From our extensive review of the state record, and the record in the district court on the habeas corpus, we can say the case was well tried by prosecutor, defense and the trial judge. Appellant received a fair trial before an impartial jury.

## II

## PROSECUTION BY INFORMATION

■ Appellant contends that he was denied due process because he was prosecuted on an information filed by the district attorney rather than on a grand jury indictment. There is no merit in this contention. The United States Supreme Court specifically approved prosecution by information in Hurtado v. California, 110 U.S. 516, 4 S.Ct. 292, 28 L.Ed. 232 (1884), and that decision has been followed ever since. Morford v. Hocker, 394 F.2d 169 (9 Cir. 1968), and cases cited therein; Sims v. Eyman, 405 F.2d 439 (9 Cir. 1969); Eyman v. Alford, 448 F.2d 306 (9 Cir. 1969).

## III

## ARIZONA SENTENCING PROCEDURE

■ Appellant contends that the Arizona sentencing procedure in murder cases, which does not allow evidence solely in mitigation of punishment to be presented to a jury, violates due process, equal protection, and the right not to plead guilty and demand a jury trial. We considered at length and rejected this same attack in Sims v. Eyman, supra, and Eyman v. Alford, supra. What we have held in those cases disposes of this issue. We note that Arizona in 1968 amended its statutes to provide for a bifurcated trial when a defendant alleges the defense of insanity (A.R.S. § 13–1621 et seq.); this fact does not alter our opinion that the former procedure was not unconstitutional.

## IV

## DIMINISHED MENTAL CAPACITY

■ Appellant contends that the exclusion of expert testimony concerning his alleged diminished mental capacity, not amounting to legal insanity, was a violation of due process. We do not agree.

Appellant contends that his plea of not guilty put in issue the elements of will, deliberation, premeditation, and specific intent, which are all elements of first degree murder (A.R.S. § 13–452). Thus, the exclusion of allegedly relevant expert testimony as to these elements of mental state was a denial of due process. To support this position, appellant cites the California Supreme Court cases which established the doctrine of diminished mental capacity (People v. Wells, 33 Cal.2d 330, 202 P.2d 53 (1949); People v. Gorshen, 51 Cal.2d 716, 336 P.2d 492 (1959)); under these cases the expert testimony would have been admissible.

However, Arizona has specifically rejected the *Wells-Gorshen* defense of "partial responsibility" or diminished mental capacity, and has adhered to the M'Naghten rule as the test for mental competence. State v. Schantz, 98 Ariz. 200, 207–210, 403 P.2d 521 (1965). The use of the M'Naghten rule without the qualification of diminished mental capacity is constitutionally permissible. Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); Sauer v. United States, 241 F.2d 640 (9 Cir.), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957); Ramer v. United States, 390 F.2d 564 (9 Cir. 1968); Eyman v. Alford, supra. There was sufficient evidence to satisfy the required mental state elements of the Arizona murder statute. State v. Narten, supra. Therefore, the exclusion of the expert testimony was proper under Arizona law and did not violate the Constitutional guarantee of due process.

### V

### ALLEGED PRIVILEGED COMMUNICATION

Appellant contends that testimony concerning a statement which he made to his wife was erroneously admitted since the statement was a privileged communication and was made in the absence of counsel. There is no merit in this contention.

An officer guarding appellant testified to certain incriminating statements made by appellant and overheard by the officer during a conversation between appellant and his wife, Mrs. Narten. The conversation took place February 22, 1963, in the sheriff's office at about 2:00 o'clock in the morning. The meeting was arranged at the request of Mrs. Narten, not at the insistence of the police, and the time was arranged for her convenience since she worked late hours. There was no compulsion or interrogation by the police. There was no evidence of surreptitious eavesdropping; the officer was only present for security reasons, guarding appellant who was charged with a capital offense. Appellant and his wife were fully aware of the officer's presence and proximity; although he did not interrogate them, at times they each asked questions of him. The officer overheard parts of their conversation when they raised their voices.

In view of these facts, the Arizona Supreme Court, relying on DeLeon v. Territory, 9 Ariz. 161, 168–169, 80 P. 348 (1905), held that the officer's testimony was properly admitted. The conversation between appellant and his wife was not a privileged communication since they knew a third party (the officer) was present; although the law renders the wife an incompetent witness, the third party could still testify. State v. Narten, supra. We believe this holding to be correct, and find no grounds upon which to disturb it. Moreover, since the incriminating statements were not deliberately elicited by the police, and were not the result of secret interrogation in the absence of counsel, we find no denial of the right to counsel under the principle of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) or Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).[4]

The judgment of the district court is affirmed.

### ORDER
### ON PETITION FOR REHEARING AND SUGGESTION FOR HEARING IN BANC

Before HAMLEY, CARTER and HUFSTEDLER, Circuit Judges.

Following the filing of the petition for rehearing and the suggestion for a hearing in banc, Judge Hufstedler was se-

---

4. The specific holding of *Escobedo* would not even be applicable to this case, since appellant's trial began before June 22, 1964. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

**192**

lected by lot in place of Judge Pope, deceased.

The panel as then reconstituted voted, two to one, to deny the petition for rehearing. Judge Hufstedler voted to grant the petition for rehearing. The panel voted unanimously to reject the suggestion for a hearing in banc.

All judges in active service having been supplied with copy of the suggestion for hearing in banc, and no judge having voted to hear the case in banc,

It is ordered that the petition for rehearing is denied and the suggestion for hearing in banc is rejected.